Slip Op. 01-62

# THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  CHIEF JUDGE GREGORY W. CARMAN

_____
DUFERCO STEEL, INC.,               :
                                   :
                Plaintiff,         :
        v.                         :
                                   :
UNITED STATES,                     :
                                   :         Court No. 99-12-00771
                Defendant,         :
                                   :
        and                        :
                                   :
BETHLEHEM STEEL CORP. & U.S.       :
STEEL GROUP, A UNIT OF USX         :
CORPORATION,                       :
                                   :
                Defendant-Intervenors.  :
_____:

[Plaintiff's motion for judgment on the agency record is denied.]


        *White & Case* (Walter J. Spak, Vincent Bowen), Washington, D.C., for Plaintiff.

        *David W. Ogden,* Acting Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Velta A. Melnbrencis*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, *Mildred E. Steward*, Attorney, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for Defendant.

        *Dewey Ballantine* (Michael H. Stein, Bradford L. Ward, Rory F. Quirk, Navin Joneja), Washington, D.C., for Defendant-Intervenors.


                                Dated: May 29, 2001

**OPINION**

**CARMAN, Chief Judge:** This action is before the Court on plaintiff Duferco Steel, Inc.'s (Plaintiff) Rule 56.2 Motion for Judgment on the Agency Record. At issue is the United States Department of Commerce's (Commerce) determination that certain cut-to-length carbon steel floor plate imported by Plaintiff falls within the scope of antidumping duty and countervailing duty orders issued in 1993. The challenged ruling was issued following a scope investigation conducted pursuant to 19 C.F.R. §351.225(d). This matter properly falls within the Court's jurisdiction under 28 U.S.C. §1581(c).

**BACKGROUND**

On June 30, 1992, members of the United States domestic steel industry (Petitioners) petitioned Commerce and the International Trade Commission (ITC) to commence antidumping (AD) and countervailing duty (CVD) investigations of certain flat-rolled carbon steel products, including cut-to-length steel plate from Belgium. The petitions defined the subject merchandise as, "certain cut-to-length carbon steel plate." The petitions further defined the scope of the proposed investigations by reference to descriptions and definitions contained in the Harmonized Tariff Schedules of the United States (HTSUS). Specifically, the petitions made reference to HTSUS, Chapter 72, Note 1(k), which, in relevant part, defines "flat-rolled products" as:

> Rolled products of solid rectangular (other than square) cross section… Flat-rolled products include those with patterns in relief derived directly from rolling (for example, grooves, ribs, checkers, tears, buttons, lozenges)… provided they do not assume the character of articles or products of other [HTSUS] headings.

In July 1992, Commerce and the ITC initiated investigations of the subject merchandise. *See Initiation of Antidumping Duty Investigations and Postponement of Preliminary*

*Determinations: Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbon Steel Flat Products, Certain Corrosion-Resistant Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate from Various Countries*, 57 Fed. Reg. 33,488 (July 29, 1992); *Initiation of Countervailing Duty Investigations and Postponement of Preliminary Determinations: Certain Steel Products from Austria, Belgium, Brazil, France, Germany, Italy, Korea, Mexico, New Zealand, Spain, Sweden, Taiwan, and the United Kingdom*, 57 Fed. Reg. 32,970 (July 24, 1992) (collectively, *Notices of Initiation*).  Based on the petitions, the agencies defined "certain cut-to-length carbon steel plate," and thus the scope of the investigation, as:

> … hot-rolled carbon steel universal mill plates (i.e., flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 millimeters but not exceeding 1,250 millimeters and of a thickness of not less than 4 millimeters, not in coils and without patterns in relief) of solid rectangular (other than square) cross section, of rectangular shape, neither clad, plated nor coated with metal, whether or not painted, varnished, or coated with plastics or other nonmetallic substances; and certain hot-rolled carbon steel flat products in straight lengths, of solid rectangular (other than square) cross-section, of rectangular shape, hot-rolled, neither clad, plated, nor coated with metal, whether or not painted, varnished, or coated with plastics or other nonmetallic substances, 4.75 millimeters or more in thickness and of a width which exceeds 150 millimeters and measures at least twice the thickness….

57 Fed. Reg. at 33,492.

 Additionally, to aid in determining the appropriate foreign like product, Commerce established several "product matching criteria" which were sent to potential targets of the AD investigation. The purpose of these criteria was to provide potential respondents with a detailed description of the types of merchandise that would be subject to investigation and to allow interested parties to raise concerns over the inclusion or exclusion of certain criteria.  One of the criteria described the subject merchandise as "whether checkered or not."  According to Commerce, the term "checkered" is generally recognized as referring to a raised pattern in relief.  None of the parties

to whom the product matching criteria were sent commented negatively on the inclusion of this phrase.

During the course of its investigation, Commerce received an inquiry from a foreign manufacturer seeking to clarify whether its product fell within the scope of the agency's investigation. This manufacturer produced steel plate that originally possessed a rectangular cross-section, but was later further worked resulting in a product with bevelled edges and a distinctly nonrectangular cross-section. In response to this inquiry, Petitioners formally amended the scope of their petitions to include products of the type produced by the foreign manufacturer – *i.e.*, carbon steel flat-rolled products which have bevelled edges or other surface or edge characteristics which might render their cross-section other than rectangular, so long as those modifications do not cause them to assume the character of products of other HTSUS item numbers.

In December 1992 Commerce published its preliminary CVD determination, incorporating the scope language contained in the *Notices of Initiation*. *See Preliminary Affirmative Countervailing Duty Determinations and Alignment of Final Countervailing Duty Determinations with Final Antidumping Duty Determinations: Certain Steel Products from Belgium*, 57 Fed. Reg. 57,750, 57,761 (December 7, 1992). At this point, Commerce had not ruled upon the foreign manufacturers' scope request.

On January 5, 1993, after evaluating the foreign manufacturer's inquiry and Petitioners' response, Commerce issued a "Decision Memorandum" on whether products of nonrectangular cross-section were included in the scope of its investigations. Commerce concluded:

> While petitioners may have cited a tariff schedule definition of flat-rolled products which excluded flat products of nonrectangular cross-section, petitioners' own scope definition does not exclude such products. Recognizing that heretofore these products have not been subject to these investigations, and that we must confront the practical issues of how

they will be treated within these investigations, we nevertheless recommend accepting petitioners' clarification that flat-rolled products of nonrectangular cross-section are covered by these investigations and that the scope of the four classes or kinds be modified to reflect this.

Decision Memorandum, From Roland McDonald to Joseph Spetrini, January 25, 1993, *reprinted in*, Defendant's Exhibits, Exhibit 7, p. 10.

Shortly thereafter, in February 1993, Commerce published its preliminary AD determination. *See Notice of Preliminary Determinations of Sales at Less Than Fair Value and Postponement of Final Determinations: Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate from Belgium*, 58 Fed. Reg. 7,075 (Feb. 4, 1993) (*Preliminary AD Determination*). Commerce again incorporated the scope language set forth in the *Notices of Initiation*. Additionally, Commerce incorporated Appendix I to the *Notice of Preliminary Determination of Sales at Less than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Argentina*, a separate determination issued the same day. 58 Fed. Reg. 7066 (Feb. 4, 1993) (*Preliminary Appendix I*). This Appendix discussed scope issues that had been raised since its investigations were initiated. It stated:

On November 25, 1992, petitioners requested that products of nonrectangular cross-section be included in the scope of the investigations regarding all four classes or kinds of merchandise. Petitioners noted that this was a clarification and not a broadening of the scope. After analyzing all information submitted on the record on this issue, we have included products of nonrectangular cross-section in the scope of all four classes or kinds.

*Id.* at 7,069.

Then, on July 9, 1993, Commerce published its final determinations in the AD and CVD investigations. *See Final Determination of Sales at Less than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate from Belgium*, 58 Fed. Reg. 37,083, 37,084 (July 9, 1993) (*Final*

*AD Determination*); *Final Affirmative Countervailing Duty Determinations: Certain Steel*

*Products from Belgium*, 58 Fed. Reg. 37273, 37274 (July 9, 1993) (*Final CVD Determination*).

Again, Commerce carried over the scope language used throughout the administrative

proceedings.  Commerce also incorporated by reference Appendix I of the final Argentina

antidumping duty determination (*Final Appendix I*).  Final Appendix I stated:

> In contrast to the petitions' explicit exclusion of products of nonrectangular shape, nowhere do the petitions specifically exclude nonrectangular cross-section products from the scope of the investigations… Consistent with the Department's practice, the written scope description is dispositive.  Based on the written descriptions in the petitions in these investigations, all products classified in the HTS items cited in the petitions fall within the written scope descriptions unless specifically excluded.  Thus, products of nonrectangular shape are not in the scope of the investigations, as they were explicitly excluded from the petitions.  However, absent a specific exclusion of any other products from the written description of the scope, all other products covered in the HTS items cited in the petitions are included within the scope, including products of nonrectangular cross section.  Products of nonrectangular and rectangular cross-sections belong to the same class or kind.  In making this determination, we have considered the following factors:  (1) the physical characteristics of the merchandise; (2) the expectations of the ultimate purchasers; (3) the ultimate use of the merchandise; (4) the channels of trade in which the merchandise moves; and (5) the manner in which the merchandise is advertised and displayed.

*Notice of Final Determination of Sales at Less than Fair Value: Certain Cold-Rolled Carbon*

*Steel Flat Products from Argentina*, 58 Fed. Reg. 37,062, 37,068 (July 9, 1993).  Additionally,

Commerce went on to clarify its position regarding products of nonrectangular cross-section by

stating:

> We believe that, having relied on HTSUS item numbers as a distinguishing factor, petitioners intended to limit their clarification to flat-rolled products whose nonrectangular cross-sections have been imparted onto the steel after the rolling process, *i.e*., to products which have been "worked after rolling" – for example, products which have been bevelled or rounded at the edges.  Thus, we have further clarified that, regarding products of nonrectangular cross-section, only those products whose nonrectangular cross-sections are achieved subsequent to the rolling process are included within the scope of the investigations.

*Id.* at 37,069.

On October 7, 1999, Plaintiff submitted a formal scope application to Commerce requesting that hot-rolled floor plate with a nonrectangular cross-section imparted during the rolling process be excluded from the scope of the AD and CVD orders. In support of its application, Plaintiff submitted technical drawings, manufacturing specifications, and detailed descriptions of the dimensions and design of its imported floor plate. Petitioners opposed Plaintiff's scope application, initially claiming they never intended to exclude nonrectangular cross-sectional steel, regardless of the point at which the nonrectangular cross-section was achieved. A series of comments were then exchanged by Petitioners and Plaintiff, ultimately causing Petitioners to alter their initial claim. Rather than argue they always intended to include steel plate with a non-rectangular cross-section, Petitioners claimed that the imported floor plate actually possessed a rectangular cross-section and, therefore, was included in the scope of the original petitions.

In November, 1999, Commerce issued its final scope ruling, agreeing with Petitioners that floor plate possesses a rectangular cross-section and finding the floor plate imported by Plaintiff to be within the scope of the AD and CVD orders. The ruling indicates Commerce based its findings on three factors: (1) the Petitioners had defined the subject merchandise by reference to HTSUS, Chapter 72, Note 1(k), which expressly included flat-rolled products with patterns in relief derived directly from rolling; (2) the lack of protest to the inclusion of "whether checkered or not" in the product matching criteria; and (3) the fact that universal mill plates with patterns in relief had been specifically excluded from the scope of the orders and that no such exclusions were specified for any other form of plate.

Plaintiff timely filed suit with this Court challenging Commerce's *Final Scope Ruling*.

## DISCUSSION

Commerce has inherent authority to define and clarify the scope of its AD and CVD orders. *See* 19 C.F.R. § 351.225(a) (1998). The agency, however, may not expand those orders in a manner contrary to their original terms. *See Ericsson GE Mobile Communications, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995), *citing*, *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Cir. 1990). The issue confronting the Court is whether Commerce's 1999 determination merely clarified the relevant orders, or whether Commerce impermissibly expanded those orders by finding Plaintiff's imported floor plate to be within their scope. Plaintiff argues this issue is resolved by determining whether products rolled to a nonrectangular cross-section are within the scope of the AD and CVD orders. Plaintiff's argument, however, assumes there is no issue as to whether floor plate possesses a nonrectangular cross-section and, thereby, mischaracterizes the question actually before the Court. To resolve this issue, the Court must determine whether Commerce's conclusion that floor plate possesses a "rectangular" cross-section as defined by the AD and CVD orders is "supported by substantial evidence and otherwise in accordance with law." 19 U.S.C. §1516a(b)(1)(B)(i) (1994). Substantial evidence is more than a "mere scintilla" of evidence. *Primary Steel, Inc. v. United States*, 834 F. Supp. 1374, 1380 (Ct. Int'l Trade 1993). It consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Under this standard, the Court will not disturb an agency determination if Commerce's factual determinations are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion. *See Heveafil Sdn. Bhd. & Filati Lastex Sdn. Bhd. v. United States*, 2001 WL 194986, *2 (Ct. Int'l Trade), *citing, Atlantic Sugar,*

*Ltd. v. United States*, 744 F.2d 1556, 1563 (Fed. Cir. 1984). Accordingly, "when applying the substantial evidence standard, the court may not substitute its judgment for that of the agency when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Budd Co. v. United States*, 746 F. Supp. 1093, 1097 (Ct. Int'l Trade 1990) (internal quotations and citations omitted).

**I.      Parties' Contentions**

Plaintiff contends two factors unambiguously indicate that its imported floor plate falls outside the scope of the relevant AD and CVD orders. First, Plaintiff contends that floor plate possesses a nonrectangular cross-section. Plaintiff cites a standard lexicographic text that defines a rectangle as "a parallelogram all of whose angles are right angles" and defines a parallelogram as "a four-sided plane figure with opposite sides parallel." *Webster's II New College Dictionary*, at 927 and 796 (1995). Plaintiff also cites to Commerce's final determination, which defines a rectangle as a product "whose four cross-sectional corners have 90 degree angles." Although Plaintiff argues Commerce's definition is overly broad and fails to include an essential element (parallel sides), it contends that even under this definition the subject floor plate clearly does not possess a rectangular cross-section. During the investigation, Plaintiff submitted technical drawings and specification sheets that illustrated the subject floor plate's "irregular and hillocky" cross-section. This information demonstrated that the floor plate possesses only two cross-sectional corners with 90 degrees, and not the four corners required by Commerce's definition. Moreover, Plaintiff submitted documentation establishing that the only way to produce an irregular or hillocky cross-section is to use patterned rollers that press the shape into the plate during the rolling process. Plaintiff argues that at no point in the proceedings

did Petitioners refute this evidence or did Commerce address its assertion that floor plate is the only type of plate that can be rolled to a non-rectangular cross-section. Finally, Plaintiff argues because Commerce was required to apply "something less than the strict mathematical understanding of 'rectangular'" in order to reach its conclusion, Commerce in fact was tacitly admitting that floor plate does not possess a rectangular cross-section. Accordingly, Plaintiff argues Commerce's conclusion that floor plate possesses a rectangular cross-section is unsupported by substantial evidence.

Second, Plaintiff contends that because floor plate's nonrectangular cross-section is imparted during the rolling process it is expressly excluded from the scope of the AD and CVD orders. Plaintiff cites Commerce's final AD and CVD determinations which expressly exclude steel plate rolled to a nonrectangular cross-section. Plaintiff points out Commerce concluded that, "petitioners intended to limit their clarification to flat-rolled products whose nonrectangular cross-sections have been imparted into the steel after the rolling process… Thus, we have further clarified that, regarding products of nonrectangular cross-section, only those products whose nonrectangular cross-sections are achieved subsequent to the rolling process are included within the scope of the investigation." *Scope Appendix*, at 30,769. From this conclusion, Plaintiff argues Commerce distinguished between products that obtain a nonrectangular cross-section during the rolling process and those products that are originally rolled to a rectangular cross-section but are subsequently altered through further manufacturing. Plaintiff argues it is clear Commerce intended to exclude the former, while explicitly including the latter within the scope of its investigation.

The United States and Defendant-Intervenors (collectively, Defendants) counter that floor plate is generally recognized as possessing a rectangular cross section and that based upon the

history of the investigations Commerce's decision reasonably reflected the intent of the parties as set forth in the original petitions and later scope clarification requests. Defendants argue these documents clearly establish that only certain products were explicitly intended to be excluded from the scope of the investigations – i.e., universal mill plates with patterns in relief and products of non-rectangular shape. With respect to other forms of hot-rolled carbon steel flat-rolled products, neither Petitioners, nor Commerce specified any exclusions. The lack of exclusionary language is argued to demonstrate the parties' intent to include plate with a textured surface – i.e., floor plate – within the scope of the entire proceeding.

Defendants further argue that once it is determined that floor plate was intended to be included in the scope of the original petition, by law it must be included in each subsequent stage of the administrative proceeding. Thus, Defendants argue that if a product is described in the petition and becomes the subject of the investigation, unless specifically excluded during the investigation, it must be the subject of the resulting AD or CVD order.

## II.    Analysis

In determining whether a particular product is within the scope of an AD or CVD order, Commerce must first consider whether the underlying petitions cover the product. *See* 19 C.F.R. § 351.225(d) & (k)(1) (2000); *see also, Ekstrom Industries v. United States,* 27 F. Supp. 2d 217, 222 (Ct. Int'l Trade 1998) ("19 C.F.R. § 351.225(k)(1) requires Commerce to first consider the petition.") If the petitions are ambiguous, Commerce must examine the preliminary and final determinations, prior notices of initiation, and any available ITC publications. *See* 19 C.F.R. § 351.225(d) & (k)(1); *see also Koyo Seiko Co. v. United States*, 834 F. Supp. 1401, 1403-04 (Ct. Int'l Trade 1993.) If the scope of the particular product is still unclear, Commerce must look to

other criteria, including an analysis of the so-called *Diversified Products* criteria. *See* 19 C.F.R. § 351.225(k). *See also*, *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 889 (Ct. Int'l Trade 1983).

Commerce examined the petitions, preliminary determinations, and the scope rulings made during the course of the investigations and determined that floor plate possessed a rectangular cross-section, albeit recognizing that the strict mathematical definition of rectangular did not apply. Commerce then concluded that the presence of a rectangular cross-section unambiguously rendered floor plate subject to the 1993 AD and CVD orders. As indicated, Commerce based its conclusion on three factors: (1) the Petitioners had defined the subject merchandise by reference to HTSUS, Chapter 72, Note 1(k), which expressly included flat-rolled products with patterns in relief derived directly from rolling; (2) the lack of protest to the inclusion of "whether checkered or not" in the product matching criteria; and (3) the fact that universal mill plates with patterns in relief had been specifically excluded from the scope of the orders and that no such exclusions were specified for any other form of plate. For the reasons stated below the Court finds two of the three factors relied upon by Commerce to be reasonable and, in sum, provide substantial evidence supporting its conclusion.

A.     Commerce Reasonably Relied Upon Footnote 5 of the Petitions to Determine that Floor Plate was within the Scope of the AD and CVD Orders

At the outset, the Court notes the United States argues that Commerce's conclusion that floor plate (i.e., plate with patterns raised in relief) was within the scope of the 1993 AD and CVD orders was legally correct because it reflected the Petitioner's original intent. The Court is chary to give credence to this argument. Although recognizing this Court has previously held that Commerce must give ample deference to the petitioner's intent when examining a petition's

description of the subject merchandise, s*ee, e.g., Torrington Co. v. United States*, 995 F. Supp. 117, 121 (Ct. Int'l Trade 1998), the better approach is for the Court to avoid subjective issues of intent and, instead, look to the petition's language to determine whether the class or kind of merchandise at issue was expressly included.

A crucial element of Commerce's decision that floor plate was within the scope of the 1993 AD and CVD orders was the fact that petitioners defined "flat-rolled products" with a "rectangular cross-section" in such a way as to alter the general understanding of what constitutes a rectangle. Specifically, in footnote 5 Petitioners referenced HTSUS, Chapter 72, Note 1(k), which expressly included flat-rolled products of rectangular cross-section that possess "patterns in relief derived directly from rolling." From this definition, Commerce determined that the opposing parallel sides normally associated with rectangularity were not strictly necessary, provided the plate possessed four ninety-degree corners. Commerce thus concluded there was a general understanding that floor plate possessed a rectangular cross-section, notwithstanding the irregular and hillocky pattern pressed into its surface.

Plaintiff argues that such reference was limited to a footnote in the petition, was not expressly adopted by Commerce, and, therefore, was never incorporated into the actual scope of the investigation. The Court is not persuaded by Plaintiff's argument. As stated, the petitions in this case described the subject merchandise as "cut-to-length carbon steel plate." The petitions further define the scope of the subject merchandise in footnote 5 by referencing the HTSUS definition for flat-rolled products. This definition states that "flat-rolled products" include products "with patterns in relief derived directly from rolling (for example, grooves, ribs, checkers, tears, buttons, [and] lozenges)." Because floor plate fits squarely within the definition of a plate with "patterns raised in relief," Commerce concluded that this language

unambiguously incorporated the HTSUS definition into the scope of the petition. The Court

finds Commerce's conclusion was both reasonable and supported by substantial evidence. The

language of the petitions unambiguously included flat rolled products with "patterns raised in

relief derived directly from the rolling process," and thus included floor plate. By law, once

Commerce determined that the scope of the original petitions included products with patterns

raised in relief within the spectrum of products possessing a rectangular cross-section, this scope

carries over to each subsequent stage of the proceedings, absent explicit exclusionary language.

*See Royal Business Machines, Inc. v. United States*, 507 F. Supp. 1007, 1014 (Ct. Int'l Trade

1980) ("Each stage of the statutory proceeding maintains the scope passed from the previous

stage. Thus, the class or kind of merchandise described in the petition, which becomes the

subject of investigation… becomes the subject of the preliminary injury determination… and the

final determinations").

The Court confronted a similar situation in *Novosteel, SA v. United States*, 128 F. Supp.

2d 720 (Ct. Int'l Trade 2001). There, the Court was required to determine whether certain types

of steel plate were "flat-rolled products" within the meaning of the relevant CVD orders. As in

the present case, Petitioners defined the term "flat-rolled products" by reference to the HTSUS

definition contained in Chapter 72, Note 1(k). The Defendant-Intervenors argued that the

HTSUS definition was not dispositive to the scope inquiry. The Court acknowledged that

HTSUS definitions were not dispositive, but went on to state "[i]f the Petitioners choose to

define 'flat-rolled product' by reference to the HTSUS, the Court finds it is a factor to be

considered, along with all factors pertinent to the issue of the intended scope of the orders." *Id.*

at 728. Similarly, in the present case, the Court cannot ignore the significance of defining "flat-

rolled products" by reference to the HTSUS. The fact that the footnote was not expressly

adopted into the subsequent scope definition is irrelevant to whether it can aid in defining the term "flat-rolled products." Accordingly, the Court finds Commerce's reliance on the HTSUS definition to be reasonable.

Plaintiff additionally argues that Commerce's conclusion conflicts with the position it adopted in the bevelled plate scope proceedings. During that proceeding, interested respondents argued that bevelled plate was excluded from the scope by virtue of language in footnote 5 that limited flat-rolled steel products to those possessing "a solid rectangular (other than square) cross section." Commerce dismissed the importance of the HTSUS definition in footnote 5 and stated that "while petitioners may have cited a tariff schedule definition of flat-rolled products which excluded flat products of nonrectangular cross-section, petitioners own scope definition does not exclude such products." Plaintiff argues that with respect to floor plate, Commerce attempted to justify its contrary scope conclusion by reference to a footnote it dismissed in an earlier proceeding. Such conduct, Plaintiff argues, "is arbitrary and capricious without the semblance of any pretense to fairness."

The Court rejects Plaintiff's argument. Plaintiff fails to recognize the distinctive nature of the questions involved in both proceedings. In the bevelled edge scope proceeding, Commerce was asked to determine whether products with a non-rectangular cross-section were within the scope of the orders. The issue was not whether bevelled steel possessed a rectangular cross-section as defined by the AD and CVD order, but whether the petitioners included the entire category of nonrectangular cross-sectional products within the scope of its petitions. To resolve this issue, Commerce looked to the express language of the petitions and reasonably concluded that the petitioners established a broader scope than that set forth in the footnote 5 definition.

In contrast, Plaintiff's scope inquiry required Commerce to determine whether floor plate possessed a rectangular or non-rectangular cross-section by extrapolating the meaning of rectangular within the context of the 1993 AD and CVD orders. Once that determination was made, the answer was clear as to whether floor plate was included in the scope of the orders. If floor plate possessed a rectangular cross-section it was within the scope; if it possessed a non-rectangular cross-section it was outside the scope because its cross-section was imparted during the rolling process. To resolve the issue, Commerce looked to the one express definition contained in the petitions – the HTSUS explanatory note cited in footnote 5. Because flat-rolled products were defined as possessing a "solid rectangular (other than square) cross-section" and including "products with patterns in relief," Commerce reasonably concluded that "something less than the strict mathematical understanding of rectangular" applied to floor plate,[1] and that floor plate possessed a rectangular cross section for purposes of the AD and CVD orders.

B.      Commerce Reasonably Relied Upon the Absence of Negative Comments to its Model Match Criteria to Determine that Floor Plate was Within the Scope of the AD and CVD Orders

During the course of an antidumping investigation Commerce, by statute, is obligated to determine whether "a class or kind of foreign merchandise" is being, or is likely to be, sold in the United States at less than its fair value. 19 U.S.C. §1673(1) (1994). To make this determination, Commerce compares the value of an allegedly dumped product imported into the United States with the value of a "foreign like product" sold in its country of origin. Commerce has substantial

---

[1] The Court notes that the inclusion of "products with patterns raised in relief" within the HTSUS definition of "flat-rolled products" is consistent with the definition of floor plate set forth in a steel industry treatise. THE MAKING AND SHAPING OF STEEL defines floor plate as:

> … flat, hot-rolled, finished steel products that come under the plate classification. Floor plates are hot-finished in the final pass or passes between one or more pairs of rolls. One roll of each pair has a pattern cut into it so that one surface of the plate… is forced into the depressions on the pattern roll to form a raised figure at regular intervals on the surface of the plate. (9th ed. at 727).

discretion to determine the methodology it will use to establish the "foreign like product" for a particular investigation. *See Koyo Seiko Co. v. United States*, 66 F.3d 1204, 1209-10 (Fed. Cir. 1995); *NTN Bearing Corp. v. United States*, 898 F. Supp. 923, 925-26 (Ct. Int'l Trade 1995). In the instant case, Commerce created model match criteria that were sent to potential respondents soliciting information regarding the inclusion of specific types of merchandise in the category of "foreign like products." Commerce made "whether checkered or not" one of its criteria. At no point did Commerce receive negative responses from any parties regarding this criterion.

Plaintiff argues that no significance can attach to the lack of negative comments because the model matching criteria were circulated too early in the proceedings for there to have been any legitimate concern over scope issues. Plaintiff argues that because of the early stage at which the model match criteria were circulated it is unreasonable to conclude that recipients would contemplate the importance these criteria would have on defining the scope of the eventual antidumping orders.

Contrary to Plaintiff's argument, the Court concludes the unreasonableness lies in the belief that model match criteria bear no consequence on the scope of an antidumping duty investigation. As Plaintiff is well aware, model match criteria are frequently employed to determine the "foreign like product" for a particular investigation. The antidumping law defines "foreign like product" as the subject merchandise and merchandise that is identical to or comparable with the subject merchandise. 19 U.S.C. §1677(16)(A)-(C) (1994). The law further defines "subject merchandise" as "the class or kind of merchandise that is within the scope" of an antidumping investigation, review, suspension agreement, or order. 19 U.S.C. §1677(25) (1994). Because the "foreign like merchandise" for a particular investigation is defined in conjunction with the subject merchandise, the two are inextricably linked for purposes of

defining the scope of an antidumping duty order. It is reasonable to conclude that the general

acceptance of checkered plate within the category of "foreign like product" indicates an

equivalent acceptance of such plate within the scope of merchandise subject to Commerce's

investigation and ultimately to the AD orders. As such, the Court finds Commerce's reliance on

the lack of negative comments to its "whether checkered or not" model match criteria provides

substantial evidence in support of its conclusion that floor plate is a flat-rolled product

possessing a rectangular cross-section.

>       C.       Commerce Unreasonably Relied on Exclusionary Language for Universal Mill
>                Plate with Patterns in Relief to Determine that Floor Plate was Within the Scope
>                of the AD and CVD Orders

Commerce relied upon what it perceived as the fact that the scope language specifically

excluded universal mill plate with patterns in relief, but did not explicitly exclude any other form

of plate. The relevant scope language states,

> These products include hot-rolled carbon steel universal mill plates (i.e., flat-rolled
> products rolled on four faces… and without patterns in relief) of solid rectangular (other
> than square) cross-section… and certain hot-rolled carbon steel flat products in straight
> lengths, of solid rectangular shape…

*Notices of Initiation*, 57 Fed. Reg. at 33,492. Defendants argue the absence of a specific

exclusion for hot-rolled carbon steel flat products in straight lengths indicates Commerce's intent

to include such products in the scope of the orders. Plaintiff counters by stating that "the

wording in the parenthetical… is a definition of universal mill plates" and that the "reference to

patterns in relief forms part of the definition." Plaintiff is correct.

Although the doctrine of *expressio unius est exclusio alterius*[2] generally supports

Defendants' position, the context in which the phrase "without patterns in relief" was used

---

[2] "[T]he expression of one thing is the exclusion of another." BLACK'S LAW DICTIONARY 521 (5th ed. 1979).

precludes its application in the present case. Moreover, the history of the investigation as well as the general understanding of what constitutes "universal mill plate" demonstrate the faulty nature of Defendants' argument. In every stage of the administrative proceeding, Commerce placed the phrase "without patterns in relief" in a parenthetical and following the modifier "i.e.." The use of a parenthetical and the abbreviated Latin form of "that is" customarily indicate an attempt to clarify or define the preceding term, and the Court finds no reason to imply a different use in the present case. Additionally, universal mill plate is defined by the HTSUS, Chapter 72, United States Additional Note 1(b) as, a "flat rolled product[] rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1,250 mm and of thickness not less than 4 mm, not in coils and without patterns in relief." As indicated earlier in this opinion, although a definition contained in the HTSUS notes is not dispositive, the fact that Commerce incorporated its explicit language into the scope description is persuasive evidence that the agency simply intended to define the term in accordance with the HTSUS. *See Novosteel*, 28 F. Supp. 2d at 728. Finally, since 1992 Commerce has published over one hundred notices of initiation, determinations or orders that include universal mill plate within their scope. In each case, Commerce used language identical to that used in the present case to describe universal mill plate. The consistency of language indicates its definitional nature and belies the notion that in every case, each petitioner sought to exclude universal mill plate with patterns in relief (if such plate actually exists). Accordingly, the Court concludes that the contextual use of the phrase "without patterns in relief" indicates Commerce's intent to generally define universal mill plate, as opposed to specifically defining the type of universal mill plate to be included in the scope of investigation.

The Court finds Commerce's reliance upon this language to be unreasonable and that it provides no support for the agency's conclusion that floor plate was intended to be within the scope of the AD and CVD orders.

### CONCLUSION

The Court finds Commerce reasonably relied upon two of the three factors cited as support for its conclusion that floor plate is within the scope of the 1993 AD and CVD orders. Although the Court finds that Commerce unreasonably relied upon the perceived lack of exclusionary language in the description of "certain hot-rolled carbon steel flat products in straight lengths, of solid rectangular shape," this finding does not alter the Court's conclusion that the agency's scope determination is supported by substantial evidence and otherwise in accordance with law. Thus, for the reasons stated above, the Court hereby holds that Commerce's 1999 scope determination is sustained.

_____
Gregory W. Carman,
Chief Judge

Dated: May 29, 2001
      New York, NY

ERRATUM


*Duferco Steel, Inc. v. United States,* Court No. 99-12-00771, Slip Op. 01-62, Dated May 29, 2001.


On Page 1, below the caption, on the third line, the words "*David W. Ogden,* Acting Assistant Attorney General" should read "*Stuart E. Schiffer,* Acting Assistant Attorney General."


May 31, 2001