**DUFERCO STEEL, INC., Plaintiff–Appellant,**

**v.**

**UNITED STATES, Defendant–Appellee,**

**and**

**Bethlehem Steel Corporation, and U.S. Steel Group, a unit of USX Corporation (now known as United States Steel LLC), Defendants–Appellees.**

**No. 01–1443.**

United States Court of Appeals, Federal Circuit.

DECIDED: July 12, 2002.

Vincent Bowen, White & Case, LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Walter J. Spak and Christopher M. Curran.

John N. Maher, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee United States. On the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and Velta A. Melnbrencis, Assistant Director. Of counsel on the brief were John D. McInerney, Chief Counsel for Import Administration; Berniece A. Browne, Senior Counsel; and Emily Lawson, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC. Of counsel was Lucius B. Lau, Attorney, Commercial Litigation Branch, Department of Justice, of Washington, DC.

Rory F. Quirk, Dewey Ballantine LLP, of Washington, DC, argued for defendants-appellees Bethlehem Steel Corporation, et al. With him on the brief were Bradford L. Ward; Michael H. Stein; and Navin Joneja. Of counsel was Jennifer Danner Riccardi.

Before RADER, SCHALL, and DYK, Circuit Judges.

DYK, Circuit Judge.

This case presents questions concerning the interpretation of the Department of Commerce ("Commerce") 1993 orders resulting from antidumping and countervail-

ing duty proceedings. Duferco Steel, Inc. ("Duferco"), an importer of carbon steel floor plate produced in Belgium, appeals from the United States Court of International Trade decision holding that its imported floor plate with "patterns in relief [*i.e.*, raised figures at regular intervals that provide a skid-resistant surface] derived directly from rolling" was within the scope of the 1993 antidumping and countervailing duty orders ("1993 final orders" or "scope orders") regarding cut-to-length carbon steel floor plate. *Duferco Steel, Inc. v. United States,* 146 F.Supp.2d 913 (CIT 2001). There is no claim in the 1999 final scope ruling that the language of the 1993 final orders can be interpreted to include appellant's product. However, Commerce concluded that its 1993 final orders covered the product because the petitions that initiated the investigation included appellant's product within the scope of the requested investigation, and no language in the 1993 final orders explicitly stated that carbon steel plate with "patterns in relief" was excluded from the scope of the orders, as had been done with respect to universal mill plates. The Court of International Trade affirmed.

We hold that Commerce's approach is inconsistent with fundamental principles of administrative law and with our own earlier decisions. Scope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it. Because Commerce made no claim in the 1999 final scope ruling under review that the scope orders here contain such language, we reverse the decision of the Court of International Trade.

BACKGROUND

Generally, "American industries may petition for relief from imports that are sold in the United States at less than fair value ('dumped'), or which benefit from subsidies provided by foreign governments." *Allegheny Ludlum Corp. v. United States,* 287 F.3d 1365, 1368 (Fed.Cir.2002) (citing 19 U.S.C. § 1675b (2000)).

Commerce determines whether there have been sales at less than fair value, 19 U.S.C. § 1673(1) (2000), or whether a subsidy has been provided, *id.* § 1671(a)(1); whereas, the International Trade Commission ("ITC") determines whether the imported merchandise materially injures or threatens to materially injure the pertinent domestic industry, *id.* §§ 1673d(b)(1), 1671d(b)(1). If both inquiries are answered in the affirmative, Commerce issues the relevant antidumping and countervailing duty orders. *Id.* §§ 1673d(c)(2), 1671d(c)(2); I Bruce E. Clubb, *United States Foreign Trade Law* §§ 21.19, 20.25 (1991).

█ An antidumping investigation is typically initiated by a petition filed by a domestic industry requesting that Commerce conduct an investigation into possible dumping. The petition initially determines the scope of the investigation. Section 1673a(b)(1) of Title 19 provides that the "petition may be amended at such time, and upon such conditions, as [Commerce] and the [ITC] may permit." 19 U.S.C. § 1673a(b)(1) (2000). Commerce has "inherent power to establish the parameters of the investigation," so that it would not "be tied to an initial scope definition that ... may not make sense in light of the information available to [Commerce] or subsequently obtained in the investigation." *Cellular Mobile Telephones and Subassemblies From Japan; Final Determination of Sales at Less Than Fair Value,* 50 Fed. Reg. 45,447, 45,449 (Oct. 31, 1985).

Commerce makes an initial determination as to whether the petition "contains

information ... supporting the allegations." 19 U.S.C. § 1673a(c)(1)(A)(i) (2000). Then Commerce must make a preliminary determination "of whether there is a reasonable basis to believe or suspect that the merchandise is being sold, or is likely to be sold, at less than fair value." *Id.* § 1673b(b)(1)(A). This is followed by a final determination "of whether the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value." *Id.* § 1673d(a)(1). The term "subject merchandise" is defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, [or] an order...." *Id.* § 1677(25). As noted above, the ITC makes a determination as to material injury or threat of material injury to the domestic industry.

After the issuance of the final antidumping order, *id.* § 1673d(c)(2), questions may arise concerning its scope. The regulations provide procedures for determining whether "a particular product is included within the scope of an ... order...." 19 C.F.R. § 351.225(a) (2001). A countervailing duty investigation follows a generally parallel procedure, but focuses on whether there is any material injury from benefits provided by foreign governments to foreign exporters. *See, e.g.,* 19 U.S.C. §§ 1671(a), 1671a, 1671b, 1671d (2000). The orders in question here are the product of such antidumping and countervailing duty proceedings.

On June 30, 1992, Bethlehem Steel Corporation ("Bethlehem"), along with other members of the domestic steel industry, filed petitions with Commerce and the ITC asking that antidumping and countervailing duties be imposed on cut-to-length carbon steel plate from Belgium. Bethlehem and the other domestic steel producers claimed that such imported merchandise was being sold and was likely to be sold at less than fair value and that foreign governments were providing subsidies to foreign exporters, which, in turn, caused "material injury" to the domestic producers. The petitions generally described the scope of the requested investigations and the subject merchandise as covering "cut-to-length carbon steel plate," which is one class of flat-rolled carbon steel products. To further describe the scope of the requested investigations, the petitions in a footnote made reference to the definition of "flat-rolled products" provided by the Harmonized Tariff Schedule of the United States ("HTSUS"), Chapter 72, Note 1(k). The pertinent language of Note 1(k) defined "flat-rolled products" as "[r]olled products of *solid rectangular (other than square) cross section,*" and stated that "[f]lat-rolled products include *those with patterns in relief derived directly from rolling* (for example, grooves, ribs, checkers, tears, buttons, lozenges) and those which have been perforated, corrugated or polished, provided that they do not thereby assume the character of articles or products of other headings." HTSUS, Chapter 72, Note 1(k) (emphases added). The petitions also described the merchandise in terms of the width and thickness of the flat-rolled products.

In July 1992, Commerce and the ITC initiated the investigations.[1] In initiating

1. *Initiation of Antidumping Duty Investigations and Postponement of Preliminary Determinations: Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbon Steel Flat Products, Certain Corrosion-Resistant Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate from Various Countries,* 57 Fed. Reg. 33,488 (July 29, 1992); *see also Initiation of Countervailing Duty Investigations and Postponement of Preliminary Determinations: Certain Steel Products from Austria, Belgium, Brazil, France, Germany, Italy, Korea, Mexico, New Zealand, Spain, Sweden, Taiwan, and the United King-*

the investigations, Commerce described "Certain Cut-to-Length Carbon Steel Plate" as including

> hot-rolled carbon steel *universal mill plates* (*i.e.*, flat-rolled products rolled on four faces ... *without patterns in relief*) *of solid rectangular (other than square) cross section* ... and certain hot-rolled carbon steel flat products in straight lengths, of solid rectangular (other than square) cross section....

*Notices of Initiation*, 57 Fed. Reg. at 33,-492; 57 Fed. Reg. at 32,973 (emphases added). In August 1992, Commerce also set forth "proposed [product] matching criteria" that helped interested parties identify the merchandise covered by the petitions in addition to allowing parties to object to any of the identified criteria. One of the criteria specified by Commerce to describe the subject merchandise was "whether checkered or not." The parties do not dispute that "checkered" refers to "raised patterns in relief." Moreover, none of the interested parties to whom the product matching criteria were sent objected to using this criterion to identify the subject merchandise.

On November 25, 1992, prompted by a foreign manufacturer's inquiry as to whether its products with bevelled edges were within the scope of the investigations, the petitioners amended their petitions. The amended petitions included "carbon steel flat rolled products *which have bevelled edges* or other surface or edge characteristics *which might render their cross section other than rectangular* ...."[2] (emphases added).

On January 25, 1993, Commerce published a decision memorandum, which, *inter alia*, addressed whether the scope of the investigation should be broadened to encompass products with a nonrectangular cross section. Although Commerce "recogniz[ed] that heretofore these products have not been subject to these investigations," Commerce "nevertheless recommend[ed] accepting petitioners' clarification that flat-rolled products of nonrectangular cross-section are covered by these investigations...."[3]

After completion of its preliminary investigation, Commerce found that "certain cut-to-length carbon steel plate ... from Belgium [is] being, or [is] likely to be, sold in the United States at less than fair value...."[4] Commerce also concluded that "benefits which constitute subsidies within the meaning of the [countervailing duty statute] are being provided to manufacturers, producers, or exporters in Belgium of certain steel products."[5]

*dom*, 57 Fed. Reg. 32,970 (July 24, 1992) (collectively, "*Notices of Initiation*").

2. Letter from Dewey Ballantine and Skadden, Arps, Slate, Meagher & Flom, to Barbara Franklin, Secretary of Commerce, and Paul Bardos, Acting Secretary of the U.S. International Trade Commission, at 10 (Nov. 25, 1992) ("*Scope Amendment*").

3. Decision Memorandum from Roland MacDonald, Director of Office of Agreements Compliance, to Joseph A. Spetrini, Deputy Assistant Secretary for Compliance, and Richard W. Moreland, Acting Deputy Assistant Secretary for Investigations, at 10 (Jan. 25, 1993).

4. *Notice of Preliminary Determinations of Sales at Less than Fair Value and Postponement of Final Determinations: Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate from Belgium*, 58 Fed. Reg. 7,075 (Feb. 4, 1993) ("*Preliminary AD Determination*").

5. *Preliminary Affirmative Countervailing Duty Determinations and Alignment of Final Countervailing Duty Determinations With Final Antidumping Duty Determinations: Certain Steel Products from Belgium*, 57 Fed. Reg. 57,750 (Dec. 7, 1992) ("*Preliminary CVD Determination*").

In July 1993, Commerce published its final scope determinations associated with the antidumping and countervailing duty investigations, reiterating the conclusions that it had drawn in its preliminary determinations.[6] The *Final AD Determination* regarding steel products from Belgium incorporated by reference Appendix I of the final Argentine antidumping duty determination to define the scope of the 1993 final order, stating that "[t]he full description of the subject merchandise is included in Appendix I to the Final Determination of Sales at Less than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Argentina (Argentine Final)...." *Final AD Determination,* 58 Fed. Reg. at 37,084.[7]

The *Final CVD Determination* regarding steel products from Belgium similarly incorporated by reference the scope appendix of the final Austrian countervailing duty determination. 58 Fed. Reg. at 37,-274. Although both the *Final AD Determination* and the *Final CVD Determination* incorporate scope appendices from different countries, both appendices use the same language to describe their respective scopes. For ease of reference, we consider only the language set forth in Appendix I of the Argentine order.

Appendix I of the *Final Argentine Determination* is entitled "Scope of the Investigations." 58 Fed. Reg. at 37,063. Appendix I identified four categories of flat-rolled steel products that were covered by the investigations, including "Certain Cut-to-Length Carbon Steel Plate." *Id.* at 37,064. Appendix I referred to HTSUS item numbers, but explained that "our written descriptions of the scope of these proceedings are dispositive." *Id.* at 37,-063.

Notably, Appendix I specifically stated that "[i]ncluded in these investigations are *flat-rolled products of nonrectangular cross-section where such cross-section is achieved subsequent to the rolling process (i.e., products which have been 'worked after rolling')*—for example, products which have been bevelled or rounded at the edges." *Id.* at 37,064 (emphasis added). Thereafter, Appendix I stated that "*absent a specific exclusion* of any other products from the written description of the scope, all other products covered in the [HTSUS] items cited in the petitions are included within the scope, including products of nonrectangular cross-section." *Id.* at 37,069 (emphasis added).

Significantly, Commerce further noted in Appendix I that since the preliminary determination "the Department has addressed the following scope issues." *Id.* at 37,064. Under the heading "Products of Nonrectangular Cross-Section" and the subheading "Department's Position," Commerce stated that "[i]n contrast to the petitions' explicit exclusion of products of nonrectangular shape, nowhere do the petitions specifically exclude nonrectangular cross-section products from the scope of the investigations." *Id.* at 37,068. However, Commerce also interpreted petitioners' 1992 scope amendment:

> We believe that, having relied on HTSUS item numbers as a distinguish-

6. *See Final Determination of Sales at Less than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate from Belgium,* 58 Fed. Reg. 37,083 (July 9, 1993) (*"Final AD Determination"*); *Final Affirmative Countervailing Duty Determinations: Certain Steel Products from Belgium,* 58 Fed. Reg. 37,273 (July 9, 1993) (*"Final CVD Determination"*).

7. *See also Notice of Final Determination of Sales at Less than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Argentina,* 58 Fed. Reg. 37,062 (July 9, 1993) (*"Final Argentine Determination"*).

ing factor, petitioners intended to limit their [scope amendment] to flat-rolled products whose nonrectangular cross-sections have been imparted onto the steel after the rolling process, *i.e.*, to products which have been "worked after rolling"—for example, products which have been bevelled or rounded at the edges.... *[O]nly those products whose nonrectangular cross-sections are achieved subsequent to the rolling process are included within the scope of the investigations.*

*Id.* at 37,069 (emphasis added).

Appendix I also described the scope orders as including:

hot-rolled carbon steel *universal mill plates* (i.e., flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 millimeters but not exceeding 1,250 millimeters and of a thickness of not less than 4 millimeters, not in coils and *without patterns in relief*), of rectangular shape, neither clad, plated nor coated with metal, whether or not painted, varnished, or coated with plastics or other nonmetallic substances; and certain hot-rolled carbon steel flat-rolled products in straight lengths, of rectangular shape, hot rolled, neither clad, plated, nor coated with metal, whether or not painted, varnished, or coated with plastics or other nonmetallic substances, 4.75 millimeters or more in thickness and of a width which exceeds 150 millimeters and measures at least twice the thickness....

*Id.* at 37,064 (emphases added).

On August 18, 1993, the ITC concluded that there was material injury or a threat of material injury to domestic industries because imports of certain flat-rolled carbon steel products were subsidized by foreign governments or sold in the United States at less than fair value.[8] The ITC incorporated by reference the scope provided in Commerce's 1993 final antidumping and countervailing duty orders. *ITC Determination* at 43,905 n. 2. In August 1993, the ITC also published a report of its investigations where it specifically included within the scope of the investigations "plate the nonrectangular cross section of which was formed by working the plate following the hot-rolling process (bevelling or rounding the edges of the plate, for example)."[9]

On October 7, 1999, Duferco "request[ed] [Commerce] to issue a scope ruling confirming that the [Cut–to–Length Carbon Steel Plate From Belgium] orders do not include hot-rolled floor plate, which has a non-rectangular cross-section imparted during the rolling process."[10] The focus of the present proceedings was on whether Duferco's carbon steel plate with patterns in relief (floor plate) was within the scope of the orders. "Patterns in relief" describe a surface pattern containing "raised figures at regular intervals," which provide a skid-resistant surface for floors

8. *See Certain Flat–Rolled Carbon Steel Products From Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, New Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom,* 58 Fed. Reg. 43,905 (Aug. 18, 1993) ("*ITC Determination*").

9. *Certain Flat–Rolled Carbon Steel Products From Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, New Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom,* ITC Pub. 2664, at I–18 (Aug.1993).

10. Letter from Walter J. Spak and Vincent Bowen, Counsel to Duferco Steel, Inc., to William M. Daley, Secretary of Commerce, at 1 (Oct. 7, 1999) (emphasis in original).

and was alleged to render the cross section nonrectangular. On November 22, 1999, Commerce issued its final scope ruling, which is the order currently under review in this court.[11]

In the *Final Scope Ruling,* Commerce concluded that the disputed items were within the 1993 final orders. However, Commerce pointed to no language in the 1993 final orders that included floor plate with patterns in relief. Commerce concluded that "the original scope definition proposed by the petitioners and supported with the corresponding HTSUS definition remains *dispositive* for the purposes of the product in question because, as explained, the existence of patterns in relief was understood as not altering rectangularity." *Final Scope Ruling* at 10 (emphasis added). The "original scope definition" was "dispositive" because the 1993 final orders "did not specify any exclusions relating to patterns in relief," *id.*, and "[t]he lack of exclusionary language regarding patterns in relief (such as those found on floor plate) ... demonstrates [Commerce's] intention to include plate with a textured surface," *id.* at 10–11. Commerce identified three factors that supported its conclusion: (1) the original petition made reference to the HTSUS definition, which included flat-rolled products with patterns in relief derived directly from rolling; (2) there was a lack of protest to inclusion of "whether checkered or not" in the proposed product matching criteria; and (3) unlike universal mill plates with patterns in relief, which were explicitly excluded from the scope of the 1993 orders, there was a "lack of exclusionary language regarding patterns in relief" for carbon steel flat-rolled products in the 1993 orders. *Id.*

Subsequently, before the Court of International Trade, Duferco moved for judgment on the agency record under rule 56.2. *Duferco Steel,* 146 F.Supp.2d at 916. To address this motion, that court summarized and agreed with Commerce's final scope ruling. *Id.* at 919. The court agreed with Commerce's approach of determining the scope of an antidumping or countervailing duty order by "first consider[ing] whether the underlying petitions cover the product." *Id.* at 921. The court concluded that "Commerce reasonably relied upon [the first] two of the three factors cited as support for its conclusion that floor plate is within the scope of the 1993 [antidumping] and [countervailing duty] orders." *Id.* at 926. The court found "unreasonabl[e]" Commerce's reliance on the third factor relating to the specific exclusion for universal mill plates because the parenthetical reference to "without patterns in relief" following the modifier "i.e." in the 1993 final orders only defined universal mill plates, rather than "specifically defining the type of universal mill plate to be included in the scope of investigation." *Id.* In sum, the court upheld Commerce's 1999 final scope ruling because it was "supported by substantial evidence and otherwise in accordance with law." *Id.* This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

### I

■ We have reviewed scope orders on a number of occasions, and the general rules are well established. We grant significant deference to Commerce's own in-

11. *Final Scope Ruling–Antidumping and Countervailing Duty Orders on cut-to-length carbon steel plate from Belgium,* U.S. Department of Commerce Memorandum from Barbara E. Tillman, Director, Office 7, to Joseph A. Spetrini, Deputy Assistant Secretary, Enforcement Group III (Nov. 22, 1999) (*"Final Scope Ruling"*).

terpretation of those orders. *Ericsson GE Mobile Communications, Inc. v. United States,* 60 F.3d 778, 782 (Fed.Cir.1995). "However, Commerce cannot 'interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." *Eckstrom Indus., Inc. v. United States,* 254 F.3d 1068, 1072 (Fed.Cir. 2001).

II

This case presents an issue of first impression—whether the scope orders can be interpreted to cover subject merchandise even if there is no language in the orders that includes or can be reasonably interpreted to include the merchandise.

The pertinent language of Appendix I, which is referenced in the orders, is as follows:

> Included in these investigations are *flat-rolled products of nonrectangular cross-section where such cross-section is achieved subsequent to the rolling process (i.e., products which have been "worked after rolling")*—for example, products which have been bevelled or rounded at the edges.

*Final Argentine Determination,* 58 Fed. Reg. at 37,064 (emphasis added).

> *[O]nly those products whose nonrectangular cross-sections are achieved subsequent to the rolling process are included* within the scope of the investigations.

*Id.* at 37,069.[12] This language cannot reasonably be interpreted to include floor plate with patterns in relief achieved during the rolling process because the patterns in relief render the cross section nonrectangular. Commerce appears to concede that steel with patterns in relief has a nonrectangular cross section according to the mathematical definition of that term; that "the pattern[s] in relief rendered the product somewhat non-rectangular;" and that patterns in relief were not the result of activities "subsequent to the rolling process."[13] At oral argument, Commerce admitted that "there [was] not specific language" in the 1993 final orders that supported Commerce's 1999 final scope ruling. Rather, in the 1999 final scope ruling under review here, Commerce, *inter alia,* relied on the fact that the petitions originally included these products through their reference to Note 1(k), and the fact that there is no language in the orders specifically excluding these products. In this court, Commerce argues that "[i]nasmuch as floor plate was includ-

12. The 1993 final orders did not adopt the terminology of Note 1(k).

We note that the language of Appendix I was also involved in the orders under review in *Novosteel SA v. United States,* 284 F.3d 1261, 1265 (Fed.Cir.2002), and in *Novosteel* we looked to Note 1(k) to define "flat-rolled," *id.* at 1271. However, in light of the fact that both parties agreed as to the general reach of the scope orders and the applicability of the Note 1(k) approach to that issue, we applied the definition set forth in Note 1(k) without deciding whether it was appropriate to use this reference to define the disputed term in the scope orders. *Id. Novosteel* did not involve the "patterns in relief" language involved here.

13. In its brief submitted to this court, Commerce concedes that the term "rectangular" "means something less than the strict mathematical understanding of 'rectangular.'" Commerce's Br. at 18 (citations omitted). Moreover, Commerce admits that Duferco's product did not satisfy the strict mathematical definition of rectangularity, stating that "a plate with a pattern in relief, such as Duferco's floor plate, was clearly covered by the petitions as a *rolled product of solid rectangular* (other than square) *cross section* even if the pattern in relief rendered the product *somewhat non-rectangular.*" *Id.* at 30 (third emphasis added).

ed in the [antidumping] and [countervailing duty] investigations, it also had to be included in the ensuing determinations and orders." Commerce's Br. at 26.

The Court of International Trade described the interpretive process that should be followed by Commerce as follows:

> In determining whether a particular product is within the scope of an [antidumping] or [countervailing duty] order, Commerce must first consider whether the underlying petitions cover the product. *See* 19 C.F.R. § 351.225(d) & (k)(1) (2000); *see also Eckstrom Industries v. United States,* 27 F.Supp.2d 217, 222 (CIT 1998) ("19 C.F.R. § 351.225(k)(1) requires Commerce to first consider the petition."). If the petitions are ambiguous, Commerce must examine the preliminary and final determinations, prior notices of initiation, and any available ITC publications. *See* 19 C.F.R. § 351.225(d) & (k)(1); *see also Koyo Seiko Co. v. United States,* 834 F.Supp. 1401, 1403–04 (CIT 1993). If the scope of the particular product is still unclear, Commerce must look to other criteria, including an analysis of the so-called *Diversified Products* criteria. *See* 19 C.F.R. § 351.225(k). *See also Diversified Products Corp. v. United States,* 572 F.Supp. 883, 889 (CIT 1983).

*Duferco,* 146 F.Supp.2d at 921–22. Similarly, the court stated that "once Commerce determined that the scope of the original petitions included products with patterns raised in relief within the spectrum of products possessing a rectangular cross-section, this scope carries over to each subsequent stage of the proceedings, absent explicit exclusionary language." *Id.* at 923 (citing *Royal Bus. Machs., Inc. v. United States,* 507 F.Supp. 1007, 1014 (CIT 1980)).

We think that the Court of International Trade's description of this interpretive process has it exactly backwards. The critical question is not whether the petition covered the merchandise or whether it was at some point within the scope of the investigation. The purpose of the petition is to propose an investigation. *See generally* 19 U.S.C. §§ 1671a(b)(1), 1673a(b)(1) (2000). A purpose of the investigation is to determine what merchandise should be included in the final order. Commerce's final determination reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order. *See generally id.* §§ 1671d(a)(1), 1673d(a)(1). Thus, the question is whether the 1993 final scope orders included the subject merchandise. *See Smith Corona Corp. v. United States,* 915 F.2d 683, 685 (Fed.Cir. 1990) ("The class or kind of merchandise encompassed by a final antidumping order is determined by the order....").

In *FAG Italia S.p.A. v. United States,* 291 F.3d 806 (Fed.Cir.2002), we recently concluded that the absence of a statutory prohibition could not be a source of Commerce's authority in antidumping cases. Just as Commerce cannot find authority based on the statute's failure to deny authority, *id.* at 816, so too we conclude that Commerce cannot find authority in an order based on the theory that the order does not deny authority.

To be sure, as we recently recognized in *Novosteel,* 284 F.3d at 1271, scope orders must necessarily be written in general terms, 19 C.F.R. § 351.225(a) (2001), and the "'Commerce Department enjoys substantial freedom to interpret and clarify its antidumping orders,'" *Novosteel,* 284 F.3d at 1269 (quoting *Ericsson,* 60 F.3d at 782), in accordance with the methodology set forth in its regulation, 19 C.F.R.

§ 351.225(k).[14] Scope orders are "interpreted with the aid of the antidumping petition, the factual findings and legal conclusions adduced from the administrative investigations, and the preliminary order." *Smith Corona*, 915 F.2d at 685. Thus, review of the petition and the investigation may provide valuable guidance as to the interpretation of the final order. But they cannot substitute for language in the order itself. It is the responsibility of the agency, not those who initiated the proceedings, to determine the scope of the final orders.[15] Thus, a predicate for the interpretive process is language in the order that is subject to interpretation. *See, e.g.*, *Ericsson*, 60 F.3d at 782. There is no claim in the 1999 final scope ruling that language in the 1993 final orders themselves can be interpreted to include the products.

Repeatedly, decisions of this court confirm that "[a]lthough the scope of a final order may be clarified, it can not be changed in a way contrary to its terms." *Smith Corona*, 915 F.2d at 686; *see also Eckstrom*, 254 F.3d at 1072. We have also noted Commerce's "inability to interpret orders contrary to their terms...." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed.Cir.1998). Thus, for example, in *Ericsson*, we addressed whether Commerce reasonably interpreted or impermissibly modified an order. The original antidumping order provided an exclusion for cellular mobile telephone ("CMT") subassemblies that were " 'specifically designed for use in CMTs, and could not be used, absent alteration, in a non-CMT device.' " *Ericsson*, 60 F.3d at 780 (quoting *Cellular Mobile Telephones and Subassemblies from Japan; Final Determination of Sales at Less Than Fair Value*, 50 Fed. Reg. 45,447, 45,448 (Oct. 31, 1985)). After reviewing the antidumping order and the corresponding scope ruling, we concluded that Commerce's attempt to clarify the order actually impermissibly modified it, and accordingly found that the Court of International Trade appropriately vacated the scope ruling. *Ericsson*, 60 F.3d at 782.

In *Eckstrom*, 254 F.3d at 1070, we again recognized the importance of the language of the final scope order in defining the merchandise subject to the order. Although we interpreted the scope of the order in light of the petitions and investigations, the cornerstone of our analysis still rested on the language of the order. *Id.* at 1072. We held that we could not

**14.** 19 C.F.R. § 351.225(k) explains the interpretive process. The regulation provides, in pertinent part, that:

> in considering whether a particular product is included within the scope of an order ..., the Secretary will take into account the following:
> (1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission.

19 C.F.R. § 351.225(k)(1) (2001).

Subsection (k)(2) of the regulation provides that if the criteria set forth in subsection (k)(1) are not dispositive, Commerce will consider the so-called *Diversified Products* factors to determine the scope of the order. Those factors were first articulated in *Diversified Products Corp. v. United States*, 572 F.Supp. 883 (CIT 1983) and include: "(i) [t]he physical characteristics of the product; (ii) [t]he expectations of the ultimate purchasers; (iii) [t]he ultimate use of the product; (iv) [t]he channels of trade in which the product is sold; and (v) [t]he manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2) (2001).

**15.** In its brief to this court, Commerce concedes that "it is the responsibility of Commerce to determine the proper scope of the investigation and of the antidumping order, not of the complainant before Commerce." Commerce's Br. at 39 (citing *Mitsubishi Elec. Corp. v. United States*, 898 F.2d 1577, 1582–83 (Fed.Cir.1990)).

give the order the broad interpretation urged by the government because such a broad construction was "belied by the terms of the Order itself." *Id.* at 1073. Accordingly, we reversed Commerce's scope determination as not supported by substantial evidence. *Id.* at 1076.

So too the very existence of section 1677j of Title 19 emphasizes the general requirement of defining the scope of antidumping and countervailing duty orders by the actual language of the orders. That section prevents the circumvention of antidumping and countervailing duty orders by including within the scope of the orders products that have been altered in minor ways so as to remove them from the literal scope of the orders. 19 U.S.C. § 1677j(c) (2000); *Wheatland*, 161 F.3d at 1371. Significantly, Congress made no provision for bringing other merchandise within the scope of antidumping and countervailing duty orders that was otherwise outside the language of those orders. We are compelled to conclude that in other respects Congress intended the language of the orders to govern.

In sum, when Commerce concluded that appellant's products were within the scope of the 1993 final orders, it impermissibly modified the orders to include products that were not within the scope of the original 1993 final orders.

CONCLUSION

For all these reasons, we hold that Commerce's 1999 final scope ruling, interpreting its 1993 final scope orders to include imported floor plate "with patterns in relief derived directly from the rolling process," is invalid. We accordingly reverse the decision of the Court of International Trade.

*REVERSED.*

COSTS

No costs.