Slip Op. 05-127

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

TIANJIN MACHINERY IMPORT &
EXPORT CORP.,

            Plaintiff,

            v.

UNITED STATES,

            Defendant,

            and

AMES TRUE TEMPER,

            Defendant-Intervenor.

</td><td>

**Before: Timothy C. Stanceu, Judge**

**Court No. 03-00732**

</td></tr>
</table>

## OPINION

[Affirming redetermination excluding cast picks from scope of antidumping duty order]

Dated: September 22, 2005

*Hume & Associates PC* (*Robert T. Hume* and *Ayesha A. Khanna*) for plaintiff.

*Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, Commercial Litigation Branch, *Jeanne E. Davidson*, Deputy Director, Commercial Litigation Branch, *Stephen C. Tosini*, Trial Attorney, U.S. Department of Justice; *Ada P. Bosque*, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for defendant.

*Wiley Rein & Feilding LLP* (*Eileen P. Bradner* and *Timothy C. Brightbill*) for defendant-intervenor.

Stanceu, Judge:  Defendant-intervenor Ames True Temper ("Ames") challenges a

redetermination of the U.S. Department of Commerce ("Commerce" or the "Department"),

issued in response to a remand order of this court, in which redetermination Commerce

concluded that certain hand tools identified as "cast picks" are not within the scope of a 1991 antidumping duty order applying to picks and mattocks (the "*Pick/Mattock Order*").[1] In the redetermination before the court, Commerce reversed its earlier ruling that cast picks were within the scope of the *Pick/Mattock Order*, which is one of four antidumping duty orders on heavy forged hand tools ("HFHTs") from the People's Republic of China ("China" or the "PRC"). Although acknowledging that cast picks are not "forged," Ames argues that Commerce nevertheless should have ruled that cast picks fall within the scope of the *Pick/Mattock Order* and urges this court to remand the challenged redetermination to Commerce for a second reconsideration. The court finds no merit in defendant-intervenor's argument and affirms Commerce's redetermination excluding cast picks from the scope of the *Pick/Mattock Order*.

## I. BACKGROUND

Commerce issued antidumping orders on each of four classes of hand tools in 1991, including the class consisting of picks and mattocks. Common language defining the scope of the investigations applied to all four of the orders. *See Antidumping Duty Orders for Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles From the People's Republic of China*, 56 Fed. Reg. 6,622 (Feb. 19, 1991) ("*HFHT Orders*"). On April 25, 2003, plaintiff Tianjin Machinery Import & Export Corporation ("Tianjin") requested a scope ruling from Commerce pursuant to regulations codified at 19 C.F.R. § 351.225(c) (2003). *See Scope Ruling Request on Cast Picks Submitted on Behalf of Tianjin Machinery Import & Export*

---

[1] Picks and mattocks are digging tools. A mattock is similar to a pick but has one broad end and one pointed end; a pick has two pointed ends. *See Heavy Forged Handtools From the People's Republic of China*, USITC Pub. No. 2357, Inv. No. 731-TA-457 (Final), at A-3 (Feb. 1991), *available at* 1991 ITC LEXIS 78, at *96-*97.

*Corporation* at 1 (Apr. 25, 2003) ("*Tianjin Scope Ruling Request*") (*Pl.'s Mot. for J. on the Agency R.*, Ex. 2). In its scope ruling request, plaintiff argued that Commerce should determine cast picks to be outside the scope of the *Pick/Mattock Order*. *See id*. at 2.

Commerce's scope ruling, issued on September 22, 2003, rejected Tianjin's arguments and concluded that cast picks were within the scope of the *Pick/Mattock Order*. Commerce relied on the product description "in the petition, the initial investigation, and the determinations of [Commerce] and the [U.S. International Trade Commission]." *Memorandum from Thomas Futtner, Acting Office Director, Office of AD/CVD Enforcement IV, to Holly A. Kuga, Acting Deputy Assistant Secretary, Group II, Import Administration* at 9 (Sept. 22, 2003) ("*Tianjin Scope Ruling*") (*Pl.'s Mot. for J. on the Agency R.*, Ex. 3). Reasoning that the scope language in the *HFHT Orders* was illustrative and not exclusionary with regard to method of production, Commerce concluded that a product need not be forged to be considered a heavy forged hand tool within the scope of the *HFHT Orders*:

> [T]he scope of the orders notes that HFHTs are manufactured through a hot forge operation, but it does not state that this is the only operation used to make HFHTs or the only process covered by the scope of the orders. Moreover, nothing in the record of this case suggests that the Department had a reason to limit the scope of this proceeding to a single production type, such as forging.

*Id*. at 11 (emphasis omitted).

Plaintiff Tianjin filed a summons and complaint in this court on October 8 and 17, 2003, respectively, challenging the *Tianjin Scope Ruling* in this proceeding and contending that because its imported picks are hand tools that are cast, not forged, these picks should be found to be outside the scope of the *Pick/Mattock Order*. On February 2, 2004, plaintiff moved for judgment on the agency record pursuant to USCIT Rule 56.2.

In response to plaintiff's motion, defendant United States moved for and obtained from this court an order for a voluntary remand. Defendant's motion sought a voluntary remand so that Commerce could reconsider the *Tianjin Scope Ruling* in view of the decision of the Court of Appeals for the Federal Circuit ("Court of Appeals") in *Duferco Steel, Inc. v. United States*, 296 F.3d 1087 (Fed. Cir. 2002) ("*Duferco*"). Plaintiff Tianjin consented to that motion, and defendant-intervenor Ames did not oppose it. On April 7, 2004, the court granted defendant's unopposed motion for a voluntary remand.

Commerce filed its redetermination pursuant to the court's remand on July 20, 2004, in which the Department reversed the determination set forth as the *Tianjin Scope Ruling* and concluded that the cast picks at issue do not fall within the scope of the *Pick/Mattock Order. See Results of Redetermination Pursuant to Court Remand for Tianjin Machinery Import & Export Corporation v. United States and Ames True Temper* at 1 (July 20, 2004) ("*Redetermination*"). In the *Redetermination*, Commerce interpreted the scope of the *HFHT Orders* to exclude the cast picks because they are not forged. Commerce, relying on *Duferco*, reasoned that because "the language of the scope is clear, the Department cannot interpret the order in a manner that impermissibly modifies it." *Id*. at 5. Defendant-intervenor Ames, successor in interest to Woodings-Verona Tool Works, Inc. ("Woodings-Verona"), the petitioner in the antidumping investigation, now challenges the *Redetermination*, urging this court to order another remand so that Commerce may reconsider its decision to exclude cast picks from the *Pick/Mattock Order*. The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000).

## II. STANDARD OF REVIEW

The court must affirm a determination concerning the scope of an antidumping order by Commerce if that determination is supported by substantial evidence on the record and is otherwise in accordance with law. *See* 19 U.S.C. §§ 1516a(b)(1)(B)(i), 1516a(a)(2)(A)(ii), 1516a(a)(2)(B)(vi) (2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

## III. DISCUSSION

This case presents the issue of whether the *Redetermination*, in which Commerce concluded that the scope language of the *HFHT Orders* excludes cast picks, is supported by substantial evidence on the record and is otherwise in accordance with law. For the reasons discussed below, the court holds that Commerce, in the *Redetermination*, correctly interpreted the scope language in determining that the picks at issue are excluded and that the findings of fact necessary for that conclusion are supported by substantial evidence on the record.

With respect to the evidentiary support on the record, defendant-intervenor does not challenge Commerce's critical finding of fact that the picks at issue in the scope determination are cast and not forged. Nor does Ames challenge the factual finding by Commerce that "[t]he evidence on the record of this scope inquiry indicates that hot forging and casting operations are different production processes."[2] *Redetermination* at 4. Instead, Ames takes issue with

---

[2] Commerce characterizes as undisputed by Ames the evidence provided by plaintiff that contrasts a casting process with a forging process. According to this evidence, casting is distinct from forging in that during the casting process, metal is heated to a molten state, poured into a mold, and allowed to harden into a solid state. The casting process causes changes to certain physical properties of the metal. During the forging process, however, the metal retains its initial

Commerce's legal construction of the scope language in the *HFHT Orders* and Commerce's

application of its regulations on scope determinations.  Ames contends that Commerce, pursuant

to those regulations, should not have construed the scope language to exclude hand tools made

by processes other than hot forging.  In support of this contention, Ames argues that the scope

should not be interpreted to exclude cast tools because the scope language expressly includes

"tampers," a type of hand tool that Ames maintains "is not produced through a hot-forge

method," asserting that it and its predecessor have produced tampers for years using exclusively

a casting method.  *See Comments of Defendant-Intervenor Ames True Temper upon Defendant*

*United States' Final Results of Redetermination Pursuant to Court Remand* at 3 (Aug. 19, 2004)

("*Comments of Defendant-Intervenor on Final Redetermination*").  Further, Ames argues that

Commerce should have examined the documents from the underlying antidumping investigation,

including the petition and the final determination by the U.S. International Trade Commission,

for guidance in interpreting the scope language.  "Had Commerce conducted such an

examination, it would have quickly found that Commerce's initial scope determination to include

cast picks in the order on picks and mattocks was proper and legally supported, and that

Commerce's *Redetermination* was contrary to its . . . regulatory duties[] and legal precedent."

*Id*. at 10.  Ames argues that Commerce, pursuant to its regulations, should have considered prior

scope rulings in which Commerce interpreted the *HFHT Orders* in the context of other hand

tools.  According to Ames, these prior scope rulings support a conclusion that the scope

---

physical properties as it is heated only to increase malleability for the forging process. *See*
*Redetermination* at 4.

language in the *HFHT Orders* does not confine the scope of the investigations to hand tools produced by a forging operation.

The various arguments offered by defendant-intervenor fall short in attempting to explain how Commerce's construction of the scope language in the *HFHT Orders* is not in accordance with law. Nor do these arguments establish that the determination to exclude cast picks from the scope of the *Pick/Mattock Order*, which resulted from application of that construction to the facts as found by Commerce, is unsupported by substantial evidence on the record.

In addressing the issue of whether the *Pick/Mattock Order* includes cast picks, the *Redetermination* begins its analysis by interpreting the scope language in the *HFHT Orders*. The *HFHT Orders* define the scope of the antidumping investigation for the four classes of subject hand tools as follows:

> The products covered by these investigations are *HFHTs* comprising the following class or kinds of merchandise: (1) Hammers and sledges with heads over 1.5 kg. (3.33 pounds) ("hammers/sledges"); (2) bars over 18 inches in length, track tools and wedges ("bars/wedges"); (3) picks and mattocks ("picks/mattocks"); and (4) axes, adzes and similar hewing tools ("axes/adzes").

> *HFHTs* include heads for drilling hammers, sledges, axes, mauls, picks and mattocks, which may or may not be painted, which may or may not be finished, or which may or may not be imported with handles; assorted bar products and track tools including wrecking bars, digging bars and tampers; and steel woodsplitting wedges. *HFHTs are manufactured through a hot forge operation in which steel is sheared to required length, heated to forging temperature and formed to final shape on forging equipment using dies specific to the desired product shape and size.* Depending on the product, finishing operations may include shot blasting, grinding, polishing and painting, and the insertion of handles for handled products. . . . Specifically excluded from these investigations are hammers and sledges with heads 1.5 kg. (3.33 pounds) in weight and under, hoes and rakes, and bars 18 inches in length and under.

*HFHT Orders*, 56 Fed. Reg. at 6,622-23 (emphasis added).

As directed by the Court of Appeals in *Duferco*, Commerce must consult the final scope language as the primary source in making a scope ruling because "Commerce's final determination reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order." *Duferco*, 296 F.3d at 1,096. In *Duferco*, the Court of Appeals, drawing from its previous precedents, expressed the fundamental principle that "[s]cope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Id*. at 1,089. The Court explained that resort to sources of information other than the final scope language, such as the petition and determinations made during the investigation, "may provide valuable guidance as to the interpretation of the final order. But they cannot substitute for language in the order itself." *Id*. at 1,097. The Court of Appeals also established a general rule "grant[ing] significant deference to Commerce's own interpretation of [scope] orders." *See id*. at 1,094-95 (citing *Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995)).

The scope language at issue in this case, in both of the pertinent paragraphs quoted above, consistently identifies the merchandise subject to investigation as "forged" hand tools. The scope language refers repeatedly to "HFHTs." *See HFHT Orders*, 56 Fed. Reg. at 6,622-23. The abbreviation "HFHTs," as used throughout the *HFHT Orders*, refers to "heavy forged hand tools." *Id*. at 6,622. The scope language imparts further clarity to the point by stating unambiguously that "HFHTs are manufactured through a hot forge operation in which steel is sheared to required length, heated to forging temperature and formed to final shape on forging equipment using dies specific to the desired product shape and size." *Id*. Moreover, the scope

language in the *HFHT Orders* makes no reference to any hand tool that is not identified as an "HFHT," *i.e.*, as a "forged" hand tool, and does not refer to any production of a hand tool by casting or by any manufacturing process that is distinct from a forging process.

Further, Commerce recognized in the *Redetermination* that construing the *Pick/Mattock Order* to include cast picks would be an attempt to interpret that order "in a manner that impermissibly modifies it." *Redermination* at 5. Commerce is not permitted to "'interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." *Duferco*, 296 F.3d at 1095 (quoting *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001)) (internal quotation marks omitted).

The court finds that Commerce's construction of the scope language to include only forged hand tools is consistent with the plain meaning of that language, interpreted as a whole. Commerce's decision to exclude from the scope of the *Pick/Mattock Order* the subject picks, which are cast rather than forged, therefore is based on a sound and reasonable construction of the scope language. In its findings of fact that the picks at issue are cast and that casting and forging are different methods of production, the *Redetermination* is supported by substantial, and undisputed, evidence. For these reasons, the court must sustain Commerce's construction of the scope language in the *HFHT Orders* and in particular Commerce's conclusion, as stated in its *Redetermination*, that the scope language in the *HFHT Orders* does not include, and may not reasonably be interpreted to include, cast picks.

Defendant-intervenor's arguments to the effect that the scope language in the *HFHT Orders* is not limited to forged hand tools rely principally on the specific reference therein to "tampers." Ames refers to the term "tamper" as "a piece of steel sheet" attached to a "metal

handle ring and support webbing" in its discussion of potential methods of production of tampers.[3] *Comments of Defendant-Intervenor Ames True Temper upon Defendant United States' Draft Redetermination Results Pursuant to Court Remand* at 3 n.6 (July 16, 2004) ("*Comments of Defendant-Intervenor on Draft Redetermination*"). Ames asserts that tampers are not produced through a hot forge operation and that "[i]t is a well-known industry fact that tampers are produced through . . . a casting method." *Id*. at 3; *see Comments of Defendant-Intervenor on Final Redetermination* at 3-4. Ames proceeds to argue from these assertions that Commerce should have regarded the scope language as "ambiguous" on the issue of production method. *See Comments of Defendant-Intervenor on Draft Redetermination* at 3-6; *Comments of Defendant-Intervenor on Final Redetermination* at 3-7.

Ames' various arguments with respect to tampers are unpersuasive. In a misguided attempt to introduce ambiguity, the construction that Ames would impart to the scope language would render that language internally inconsistent and self-contradictory. In the *Redetermination*, Commerce reasonably construed the plain meaning of the scope language to include only hand tools that are forged. In challenging that construction, defendant-intervenor offers an unsupported factual assertion that tampers are not produced by forging and its further assertion, irrelevant to the question of whether forged tampers exist, that its own tampers are produced by casting. Based on these flawed assertions, Ames would have this court reject Commerce's internally consistent construction of the scope language in favor of an

---

[3] In a prior proceeding, Ames defined "tampers" similarly: "tampers are essentially square plates with reinforcing ribs set at a 90-degree angle to the plate, which converge at the center. The center consists of a hole wherein a handle can be inserted." *Letter from Wiley Rein & Fielding LLP for Defendant-Intervenor Ames True Temper, to Import Administration, U.S. Department of Commerce* at 7 (Aug. 25, 2003) (*Redetermination*, Admin. R. Doc. No. 1).

unreasonable, internally inconsistent construction that includes cast hand tools. This the court cannot do.

The court observes that common definitions of the term "tamper," as used in the context of hand tools, are far broader than Ames suggests. The word "tamper" is used to refer to "a tamping-bar; an instrument or machine used for tamping." 17 *The Oxford English Dictionary* 602 (2d ed. 1989); *see also Academic Press Dictionary of Science and Technology* 2,166 (1992) (defining "tamper" as "any of various hand-operated or power-driven machines used to tamp materials"). The term "tamper," as applied to hand tools, is not limited to the particular type of tool identified by Ames, which consists of a square plate that is allegedly cast in a design that accommodates the addition of a separate handle. Notably, the scope language places "tamper" in the context of an example of either a "bar product" or a "track tool." *HFHT Orders*, 56 Fed. Reg. at 6,622 ("*HFHTs* include . . . assorted bar products and track tools including wrecking bars, digging bars and tampers."); *see also Heavy Forged Handtools From the People's Republic of China*, USITC Pub. No. 2357, Inv. No. 731-TA-457 (Final), at A-3 (Feb. 1991), *available at* 1991 ITC LEXIS 78, at \*96-\*97. The tampers that constitute bar products, *i.e.*, "tamping bars," have integral handles and bear little or no resemblance to the cast square-plate tamper that Ames identifies.[4] Various tampers described by technical sources as "track tools" used in the railroad

_____

[4] *See, e.g.*, *Forest Serv., U.S. Dep't of Agric.*, *Handtools for Trail Work: 2005 Edition* 22 (Feb. 2005) ("A digging and tamping bar is about the same length as a crowbar, but much lighter. It is designed with a chisel tip for loosening dirt or rocks and a flattened end for tamping. These bars are not prying tools. Bars are approximately 70 inches long with a 2-inch-wide tamping end.").

industry also differ physically from the "square plate" cast tool described by Ames.[5] The court cannot look favorably upon a construction of the scope language that requires an impermissibly narrow interpretation of the term "tamper" and a disregard of the context in which that term is used.

The arguments Ames advances before this court rely not only on a self-contradictory construction of the scope language but also on an assertion of fact that is unsupported by evidence on the record. Ames cites to no record evidence to support its assertion that tampers are not produced by a forging operation. Ames argues that it is "a well-known industry fact" that tampers are produced by casting. Ames also cites to "the longstanding experience of both Chinese respondents and Ames to produce tampers using a method other than hot forging" and the claim that "as noted by two of the Chinese exporters in the 12th administrative review of the underlying antidumping order, the companies sold only cast tampers to the United States." *Comments of Defendant-Intervenor on Draft Redetermination* at 3-4; *see Comments of Defendant-Intervenor on Final Redetermination* at 3. Defendant-intervenor's unsupported assertions fail to convince the court that Commerce should have found, based on substantial evidence on the record, that forged tampers did not exist during the period of investigation or that they do not exist now.

---

[5] *See, e.g.*, *Railway Age's Comprehensive Railroad Dictionary* 243 (2nd ed. 2002) (defining "tamping bar" as "[a] steel bar with a blade on each end used to drive ballast beneath the ties"); *Construction Glossary: An Encyclopedic Reference and Manual* 78 (2nd ed. 1993) (defining, in the context of railroad work, "tamping bar" as a "[s]teel bar with a blade on each end, used to drive ballast beneath the ties"); *Academic Press Dictionary of Science and Technology* 2,166 (1992) (defining "tamping pick" as "a wide, flat-headed pick used to drive ballast under railroad ties").

With respect to the Department's regulations, Ames relies on 19 C.F.R. § 351.225(k)(1), which requires generally that "in considering whether a particular product is included within the scope of an order or a suspended investigation, [Commerce] will take into account the . . . descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of [Commerce] (including prior scope determinations) and the [U.S. International Trade Commission]." 19 C.F.R. § 351.225(k)(1) (2004). Regarding the petition, Ames points to the "Scope of the Investigation" section, which states that the like product consists of "all imports from the PRC currently classified under" specified tariff provisions, which tariff provisions are set forth in the scope language in the *HFHT Order*, with exceptions only for hoes and rakes and for bars eighteen inches and under. *Antidumping Petition of Woodings-Verona Tool Works, Inc., for Heavy Forged Hand Tools, With or Without Handles, From the People's Republic of China* at 11 (Apr. 4, 1990) (*Tianjin Scope Ruling Request*, Ex. 4). With respect to the investigation by the U.S. International Trade Commission, Ames cites a statement in its final determination that "[t]he method used *most often* in the production of the subject products is forging." *Heavy Forged Handtools From the People's Republic of China*, USITC Pub. No. 2357, Inv. No. 731-TA-457 (Final), at A-4 (Feb. 1991), *available at* 1991 ITC LEXIS 78, at *97 (emphasis added).

In its arguments addressing § 351.225(k)(1), Ames fails to recognize that Commerce, before "taking into account" information from the various sources identified therein, first must conclude that the language of the order pertaining to scope is "subject to interpretation" on the issue presented by the merchandise under consideration. *See Duferco*, 296 F.3d at 1097 ("Thus, a predicate for the interpretive process is language in the order that is subject to interpretation.").

For the reasons discussed above, Commerce correctly interpreted the scope language in the *HFHT Orders* as unambiguous on the issue of excluding cast tools. That language, therefore, is not "subject to interpretation" on the issue of whether cast picks are included within the scope of the *Pick/Mattock Order*.

Commerce appeared to acknowledge, even in the original scope ruling, that the scope language in the *HFHT Orders* is not ambiguous and limits the scope to hand tools produced through forging. *See Tianjin Scope Ruling* at 10. In the original scope ruling, Commerce quoted the language in the *HFHT Orders* stating that "HFHTs are manufactured through a hot forge operation in which steel is sheared to required length, heated to forging temperature and formed to final shape on forging equipment using dies specific to the desired product shape and size." *Id*. (internal quotation marks omitted). The Department observed in the *Tianjin Scope Ruling* that "[r]ead alone, this language seems to indicate that forging is the only possible manufacturing process for HFHTs." *Id*. The *Tianjin Scope Ruling* then proceeded to reach the opposite conclusion on the question of cast hand tools by resorting to the information from the various sources identified in § 351.225(k)(1). *See id*. at 10-12. Again, as the Court of Appeals emphasized in *Duferco*, the petition and the investigation "may provide valuable guidance" but "cannot substitute for language in the order itself." *Duferco*, 296 F.3d at 1,097.

Defendant-intervenor's argument based on past Commerce scope rulings interpreting the *HFHT Orders*, for which Ames cites specifically to past rulings addressing a pry bar, a Pulaski tool,[6] and a skinning axe, is also unconvincing. *See Comments of Defendant-Intervenor on Final*

---

[6] A "Pulaski tool" is a tool with the "ability to cut and to dig" and has "one part of the head shaped like an axe for cutting and the other part shaped like a hoe or mattocks (sic) for digging." *Memorandum from Thomas Futtner, Acting Director, Office 4, Import Administration,*

*Redetermination* at 11; *see also Memorandum from Thomas F. Futtner, Acting Director, Office 4, Import Administration, to Holly A. Kuga, Acting Deputy Assistant Secretary, Import Administration* at 6-12 (Mar. 8, 2001) ("*Pry Bar Scope Ruling*") (*Redetermination*, Admin. R. Doc. No. 1, Ex. 7); *Memorandum from Thomas Futtner, Acting Director, Office 4, Import Administration, to Holly A. Kuga, Acting Deputy Assistant Secretary, Group II, Import Administration* at 5-7 (Mar. 8, 2001) (including "Pulaski tools" within the scope of the order) (*Tianjin Scope Ruling Request*, Ex. 2); *Memorandum from Thomas F. Futtner, Acting Office Director, AD/CVD Enforcement, Group II, Office 4, to Holly A. Kuga, Acting Deputy Assistant Secretary for Import Administration* at 3-6 (Mar. 9, 2001) (including skinning axes within the scope of the order) (*Pl.'s Mot. for J. on the Agency R.*, Ex. 7). A prior scope ruling on a particular product, even if falling within the ambit of the "prior scope determinations" identified in § 351.225(k)(1) as sources to be consulted by Commerce, is not designated by that regulation as controlling or precedential in a scope ruling on a different product. Moreover, under the principles recognized by the Court of Appeals in *Duferco*, Commerce may not disregard the effect of scope language that does not include, and cannot reasonably be interpreted to include, the product under consideration in the scope proceeding. It makes no difference that Commerce, in prior scope determinations on different products, might be shown to have disregarded the effect of that same scope language.

Defendant-intervenor makes an additional argument to support a request that this court remand this matter to Commerce for reopening of the record and for the soliciting of information

*to Holly A. Kuga, Acting Deputy Assistant Secretary, Group II, Import Administration* at 1 (Mar. 8, 2001) (internal quotation marks and citation omitted) (*Tianjin Scope Ruling Request*, Ex. 2).

on how tampers are produced, the use of production methods other than hot forging in manufacturing hand tools, and the steps leading up to the issuance of the *HFHT Orders*. Ames argues that the court should order such a remand because Commerce placed on the administrative record, without notice to the parties, two documents from the proceeding resulting in the *Pry Bar Scope Ruling*. Commerce cited one of these documents in the *Redermination* to point out that Ames, in that previous proceeding, had submitted through counsel a letter acknowledging that tampers are produced by casting, welding or forging. *See Letter from Wiley Rein & Fielding LLP for Defendant-Intervenor Ames True Temper, to Import Administration, U.S. Department of Commerce* at 7 (Aug. 25, 2003) ("Tampers are generally cast, but can be welded or forged.") (*Redetermination*, Admin. R. Doc. No. 1).

The court finds no merit in defendant-intervenor's argument concerning the two documents that Commerce added to the record. This argument is directed, at least in part, to an opportunity to place on the record new information to rebut the statement Ames previously made concerning forging of tampers. However, the court does not discern in Commerce's supplementing the record with the two documents at issue a justification for an additional remand. Commerce based the *Redetermination* on its correct conclusion of law that the scope language unambiguously excludes cast hand tools such as the picks at issue in this proceeding. The scope language itself, rather than the earlier statement by Ames to the effect that tampers could be forged as well as cast, was identified in the *Redetermination* as the basis for that conclusion of law. Therefore, if there was error in the failure of Commerce to notify the parties of the inclusion of the two additional documents and to provide the parties an opportunity

to submit additional information, it was harmless error and not an adequate basis upon which this court may order another remand.

### IV. CONCLUSION

Commerce employed a reasonable construction of the scope language in the *HFHT Orders* in determining that the *Pick/Mattock Order* excludes the cast picks at issue in the *Redetermination*. The findings of fact necessary to support the *Redetermination*, the principal ones of which defendant-intervenor does not challenge in this proceeding, are supported by substantial evidence on the record. Commerce's *Redetermination* is therefore affirmed, and judgment will be entered accordingly.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: September 22, 2005
New York, New York