Slip Op. 06-110

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| OLYMPIA INDUSTRIAL, INC., | : | |
| Plaintiff, | : | |
| v. | : | |
| UNITED STATES, | : | Before: Richard K. Eaton, Judge |
| Defendant, | : | |
| and | : | Court No. 04-00647 |
| AMES TRUE TEMPER, | : | |
| Deft.-Intervenor. | : | |

OPINION

[United States Department of Commerce's Final Scope Ruling sustained]

Dated: July 24, 2006

*Hume & Associates, PC* (*Robert T. Hume, Akil Vohra,* and *Jon C. Cooper*), for plaintiff.

*Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United Sates Department of Justice (*Stephen Carl Tosini*), for defendant.

*Wiley, Rein & Fielding, LLP* (*Charles Owen Verrill, Jr.* and *Timothy C. Brightbill*), for defendant-intervenor.

Eaton, Judge: This matter is before the court on plaintiff Olympia Industrial, Inc.'s ("plaintiff" or "Olympia") motion for judgment upon the agency record pursuant to USCIT Rule 56.2. By

its motion, plaintiff challenges the determination of the United States Department of Commerce ("Commerce" or the "Department") that its multi-use tough tool ("MUTT") is included within the scope of the antidumping duty orders covering heavy forged hand tools ("HFHTs") from the People's Republic of China ("PRC"), specifically the order applicable to axes, adzes and similar hewing tools.  *See* Final Scope Ruling—Request by Olympia Industrial, Inc. for a Scope Ruling on the MUTT (ITA Dec. 9, 2004) ("Final Scope Ruling");  *see also* HFHTs, Finished or Unfinished, With or Without Handles From the PRC, 56 Fed. Reg. 6622 (Feb. 19, 1991) ("HFHTs Orders").

Plaintiff seeks a remand of the Final Scope Ruling to allow Commerce to reconsider its findings.  *See* Pl.'s Mem. of Pts. Auth. Supp. R. 56.2 Mot. ("Pl.'s Mem.") at 16.  Defendant United States ("defendant" or the "Government"), on behalf of Commerce, opposes the motion and requests that the Department's Final Scope Ruling be sustained.  *See* Def.'s Response to Pl.'s Mot. ("Def.'s Resp.") at 1.  Defendant-intervenor Ames True Temper ("Ames") joins in opposition to plaintiff's motion.  *See* Def.-Int.'s Response to Pl.'s Mot. ("Def.-Int.'s Resp.") at 1.

Jurisdiction lies with 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(2)(B)(vi) (2000).  Because the MUTT's utility as a

tool comes from its steel head with a sharp blade that can be used for cutting and chopping, the court finds that it is a hewing tool similar to an axe or adze and, thus, sustains Commerce's Final Scope Ruling.

BACKGROUND

On March 25, 2003, Commerce published notice that it would conduct an administrative review of merchandise subject to the four antidumping duty orders on HFHTs from the PRC for the period beginning February 1, 2002 and ending January 31, 2003.  *See* Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 68 Fed. Reg. 14,394, 14,395 (ITA Mar. 25, 2003).  On July 10, 2003, Commerce notified Olympia that data concerning scrapers, with or without handles, should be submitted as those tools were subject to the order applicable to axes, adzes, and similar hewing tools ("axes/adzes order").  *See* Scope Ruling Request on Scrapers Submitted on Behalf of Olympia Industrial, Inc. (Oct. 9, 2003) ("Scope Ruling Request") at 3.  On October 9, 2003, plaintiff submitted an application to Commerce pursuant to 19 C.F.R. § 351.225(c) (2005),[1] asking the agency to issue a scope ruling finding that

_____

[1]     The regulation provides, in pertinent part, that:

Any interested party may apply for a ruling as to whether a particular product is within the scope of an order or a suspended

(continued...)

the MUTT did not fall within the ambit of the HFHTs Orders.  *See*

*id.* at 10.  Pursuant to its regulations, Commerce engaged in an

initial scope investigation and found that the language of the

HFHTs Orders was not dispositive of the scope question.  *See*

Final Scope Ruling at 2.  Thus, on December 2, 2003, in

---

[1](...continued)
investigation.  The application must be
served upon all parties on the scope service
list [which includes all persons that have
participated in any segment of the
proceeding] . . . and must contain the
following, to the extent reasonably available
to the interested party . . .

(i) A detailed description of the
product, including its technical
characteristics and uses, and its
current U.S. Tariff Classification
number;

(ii) A statement of the interested
party's position as to whether the
product is within the scope of an
order or a suspended investigation,
including:

(A) A summary of the reasons for
this conclusion,

(B) Citations to any applicable
statutory authority, and

(C) Any factual information
supporting this position, including
excerpts from portions of the
Secretary's or the Commission's
investigation, and relevant prior
scope rulings. . . .

19 C.F.R. § 351.225(c).

accordance with 19 C.F.R. § 351.225(e),[2] Commerce initiated a

formal scope inquiry.  *See id.*  To facilitate its investigation,

Commerce instructed the parties to submit supplemental filings.


    As part of those filings, Commerce instructed Olympia to

identify the specific MUTT models that were to be examined.  *See*

Pl.'s Mem. at 3.  Olympia complied, stating that the models to be

reviewed were "three MUTT blades (5"x4", 8"x4" and 9"x7") without

handles and the same MUTT blades with handles identified by eight

model numbers . . . 64-386, 64-389, 64-392, 64-393, 64-394, 64-

396, 64-397 and 64-398."  *Id*. at 3-4.  After analyzing the MUTT

based on the additional information obtained in the scope

inquiry, Commerce determined that it was subject to the terms of

the axes/adzes order because it was reasonable to find the tool

to be an axe, adze, or similar hewing tool.  *See* Final Scope

Ruling at 1.

---

[2]      Under 19 C.F.R. § 351.225(e):

        If the Secretary finds that the issue of
        whether a product is included within the
        scope of an order . . . cannot be determined
        based solely upon the application and the
        descriptions of the merchandise referred to
        in paragraph (k)(1) of this section, the
        Secretary will notify by mail all parties on
        the Department's scope service list of the
        initiation of a scope inquiry.

19 C.F.R. § 351.225(e).

STANDARD OF REVIEW

When reviewing Commerce's final determination finding a particular type of merchandise to be within the class or kind of merchandise described in an antidumping duty order, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"  *Id.* (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  Finally, the possibility of drawing two opposite, yet equally justified conclusions from the record will not prevent the agency's determination from being supported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

DISCUSSION

I.   Relevant Law

Commerce's regulations require the agency to engage in a two-step analysis when determining whether particular merchandise is included within the scope of an antidumping duty order.[3] First, upon receiving an application from an interested party,[4] Commerce is directed to conduct an investigation that is limited to the consideration of: (1) the descriptions contained in the petition filed by domestic interested parties seeking the original antidumping order; (2) the initial antidumping investigation; and (3) any relevant determinations issued by the International Trade Commission ("ITC" or the "Commission").  *See* 19 C.F.R. § 351.225(k)(1);[5] *see also* 19 C.F.R. § 351.202(a) ("The

---

[3]     Once the product is determined to be within the scope of the order, it is then referred to as subject merchandise. "Subject merchandise" is defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921."  19 U.S.C. § 1677(25).

[4]     Section 1677(9)(A) of Title 19 provides, in relevant part, that "[t]he term 'interested party' means . . . a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise . . . ."  19 U.S.C. § 1677(9)(A).

[5]     The regulation provides that:

> With respect to those scope determinations that are not covered under paragraphs (g) through (j) of this section, in considering whether a particular product is included within the scope of an order or a suspended

(continued...)

Secretary normally initiates antidumping . . . investigations based on petitions filed by a domestic interested party."). Commerce may also consider the Harmonized Tariff Schedule of the United States ("HTSUS") subheading under which the product is imported.  The HTSUS subheading for a product, however, is not dispositive of whether that product falls within the scope of an antidumping duty order.  *See Smith Corona Corp. v. United States*, 915 F.2d 683, 687 (Fed. Cir. 1990).  If Commerce's review of this evidence leads it to conclusively determine that the product is, or is not included within the scope of the order, the Department is then required to issue a final scope ruling.  *See* 19 C.F.R. § 351.225(d) ("If the Secretary can determine, based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of this section, whether a product is included within the scope of an order . . . the Secretary will issue a final ruling . . . .").

Where Commerce finds that the information reviewed in the

---

[5](...continued)
investigation, the Secretary will take into account the following:

(1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission.

19 C.F.R. § 351.225(k)(1).

initial investigation is not dispositive, it then proceeds to

notify the parties that it will begin a formal scope inquiry in

which it examines the factors commonly referred to as the

"*Diversified Products*" criteria in reference to the case where

they were first set forth.  *See Diversified Prods. Corp. v.*

*United States*, 6 CIT 155, 162, 572 F. Supp. 883, 889 (1983).

These factors, which have since been reduced to a regulation, are

as follows:

> (i)   The physical characteristics of the product;
> (ii)  The expectations of the ultimate purchasers;
> (iii) The ultimate use of the product;
> (iv)  The channels of trade in which the product is
>        sold; and
> (v)   The manner in which the product is advertised and
>        displayed.

19 C.F.R. § 351.225(k)(2).


     The regulation, however, merely provides guidance to the

Department during its scope investigation.  "The language of the

order determines the scope of an antidumping duty order."  *Tak*

*Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir.

2005).  Where the order's scope language does not expressly

address the status of a particular product, the order "may be

interpreted as including subject merchandise only if [it]

contain[s] language that . . . may be reasonably interpreted to

include it."  *Duferco Steel, Inc. v. United States*, 296 F.3d

1087, 1089 (Fed. Cir. 2002).  In other words, the language of the

order controls Commerce's inquiry.  *See id*. at 1097 ("[R]eview of the petition and the [antidumping] investigation may provide valuable guidance as to the interpretation of the final order . . . [b]ut they cannot substitute for language in the order itself."); *see also Vertex Int'l, Inc. v. United States*, 30 CIT __, __, slip op. 06-10 at 7–8 (Jan. 19, 2006) (not published in the Federal Supplement); *Tianjin Mach. Import & Export Corp. v. United States*, 29 CIT __, __, 394 F. Supp. 2d 1369, 1373–74 (2005) ("Commerce must consult the final scope language as the primary source in making a scope ruling because Commerce's final determination reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order.") (internal quotation marks omitted); *Allegheny Bradford Corp. v. United States*, 28 CIT __, __, 342 F. Supp. 2d 1172, 1184 (2004) ("The language of an order is the cornerstone of a court's analysis of an order's scope.") (internal quotation marks omitted).

Thus, the court's task is to determine whether Commerce, in the Final Scope Ruling, reasonably interpreted the scope language of the HFHTs Orders to include the MUTT.

II.  Results of the Department's Initial Investigation

Following the regulation's procedures, Olympia submitted its

application to Commerce asking the agency to issue a final scope

ruling that the MUTT was not included within the HFHTs Orders.

In its application, Olympia contended that the words in the

original order clearly indicated that the MUTT was outside the

scope of the order.  The scope language provided that:

> The products covered by these investigations are HFHTs
> comprising the following classes or kinds of
> merchandise: (1) Hammers and sledges with heads over
> 1.5 kg. (3.33 pounds) ("hammers/sledges"); (2) bars
> over 18 inches in length, track tools and wedges
> ("bars/wedges"); (3) picks and mattocks
> ("picks/mattocks"); and (4) axes, adzes and similar
> hewing tools ("axes/adzes"). . . .
>
> HFHTs are manufactured through a hot forge operation in
> which steel is sheared to required length, heated to
> forging temperature and formed to final shape on
> forging equipment using dies specific to the desired
> product shape and size.  HFHTs are currently provided
> for under the following *Harmonized Tariff System* (HTS)
> subheadings: 8205.20.60, 8205.59.30, 8201.30.00, and
> 8201.40.60.  Specifically excluded from these
> investigations are hammers and sledges with heads 1.5
> kg. (3.33 pounds) in weight and under, hoes and rakes,
> and bars 18 inches in length and under.

HFHTs Orders, 56 Fed. Reg. at 6622–23 (emphasis in original).

For Olympia, the order supported its contention that the

MUTT is not included in the scope, primarily because it views the

MUTT as a scraper, and the order does not specifically mention

scrapers.  *See* Scope Ruling Request at 5.  Olympia's application

further insisted that "[a] scraper is not a tool that is

'similar' to an axe or adze . . . ."  *Id*.  Moreover, Olympia

argued that the MUTT must be excluded from the order because it

entered the MUTT under HTSUS subheading 8205.59.5510, which was not listed in the order.  In sum, Olympia maintained that, "[i]n the case of scrapers, both the language [of the HFHTs Orders] and the designated HTSUS subcategories are clearly dispositive of the issue, and do not include scrapers."  *Id*. at 4 (emphasis in original).

Plaintiff's application also provided Commerce with the following description of the MUTT:

> The product in question is a scraper, with or without a handle.  Olympia imports the scraper without a handle, but generally sells the scraper with a handle using the trademark MUTT.  Olympia sells three (3) types of scrapers with blades that measure 5"x4", 8"x4", and 9"x7".
>
> A scraper is a hand tool used in landscaping with a long wooden handle and chisel-like blade at the end. More specifically, a scraper can be used for cutting roots, for edging, and even for chipping ice on driveways or sidewalks. . . .
>
> The scrapers imported by Olympia are made of steel and manufactured using a forging process.

Scope Ruling Request at 2 (footnote omitted).  According to plaintiff, the merchandise at issue is a forged scraper with a steel head and varying sized sharpened blades.

Along with the descriptions provided by plaintiff's initial application, Commerce also had at its disposal: (1) the language contained in the domestic industry's petition asking the

Department and the ITC to provide relief from the claimed

injurious effects of HFHTs imports; (2) the original ITC final

injury determination; and (3) the applicable HTSUS subheading

under which Olympia was entering the MUTT.  *See generally* HFHTs,

With or Without Handles, From the PRC-Antidumping Petition of

Woodings-Verona Tool Works, Inc. (Apr. 4, 1990) (the "Petition");

HFHTs From the PRC, Determination of the Commission in Invs. No.

731-TA-457 (Final), USITC Pub. 2357 (Feb. 1991) ("Final Injury

Determination"); HTSUS 8205.59.5510 (2003).


In the Petition, the domestic industry provided the

following description:

> The manufacturing process is generally described as a
> hot forge operation in which fine grain special bar
> quality steel of the needed metallurgy and cross-
> sectional dimension is sheared to the required length,
> heated to forging temperature in a fossil fuel furnace,
> and formed to final shape on forging equipment using
> dies specific to the desired product shape and size.
> If heat treating is required, the formed shape is
> quenched in a suitable media, such as an oil bath or a
> water spray, and then tempered to the required
> hardness. . . .

> The merchandise in question is all imports from the PRC
> currently classified under the following subheadings of
> the [HTSUS], and before January 1, 1989, under the item
> numbers of the Tariff Schedules of the United States
> Annotated ("TSUSA"):

>> HTSUS 8205.20.60/TSUSA 651.2300
>> Hammers and Sledges, with or without their
>> Handles with Heads over 1.5 Kg (3.25 pounds)
>> each

>> HTSUS 8205.59.30/TSUSA 651.2500

Crowbars, Track Tools, Wedges of Iron or
Steel

HTSUS 8201.30.00/TSUSA 648.5300
Picks and Mattocks/(as of 1/1/89) Mattocks,
Picks, Hoes, and Rakes and Parts Thereof

HTSUS 8201.40.60/TSUSA 648.6700
Axes, Adzes, etc./(as of 1/1/89) Axes and
Hewing Tools Other than Machetes and Parts,
Base Metal

The four classification subheadings listed above
provide the scope of this Petition and describe four
distinct like product groups (and class or kind of
merchandise groups) except that (1) hoes and rakes in
HTSUS 8201.30.00 are not heavy forged hand tools and
are not subject to investigation, and (2) bars eighteen
inches and under in HTSUS 8205.59.30 are not heavy hand
tools and are not subject to investigation. . . .

Petition at 2, 11–12.

Commerce also considered the language of HTSUS 8205.59.5510,

the heading under which Olympia enters the MUTT.

8205          Handtools (including glass cutters) not
              elsewhere specified or included; blow torches
              and similar self-contained torches; vises,
              clamps and the like, other than accessories
              for and parts of machine tools; anvils;
              portable forges; hand-or pedal-operated
              grinding wheels with frameworks; base metal
              parts thereof:

8205.59.55

     10   Other . . . .

HTSUS 8205.59.5510 (2003).

Finally, the product description contained in the ITC Final

Injury Determination provided that:

> The HFHTs included in the scope of this investigation
> consist of the following products, finished or
> unfinished, with or without handles: (1) hammers,
> sledges, and mauls (hammers and sledges or 'striking
> tools'), including drilling hammers and woodsplitting
> mauls, with heads over 1.5 kilograms (3.3 pounds) each;
> (2) bars of over 18 inches (45.72 centimeters) in
> length, track tools, and wedges (bars and wedges or
> 'bar tools'), including wrecking bars, digging bars,
> tampers, and steel woodsplitting wedges; (3) picks and
> mattocks ('digging tools'); and (4) axes, adzes, and
> similar hewing tools (axes and adzes or 'hewing
> tools'). . . .

> The method used most often in the production of the
> subject products is forging.  This process involves
> shearing the raw material (fine-grain, special bar-
> quality steel) to a specific size and heating it in an
> electric, gas, coal, or oil-fired furnace to a
> temperature that renders the steel malleable.  The raw
> material is then shaped into the desired form by
> intermittent blows of forging hammers fitted with
> impression dies.  After forging, numerous steps are
> undertaken before manufacturing is completed.  These
> steps include trimming excess metal; heat treating to
> increase strength; and grinding, polishing, and
> painting to obtain a finished appearance.

Final Injury Determination at 95, 97-98.

After reviewing the above materials in light of the scope

language of the HFHTs Orders, Commerce concluded that they failed

to establish the status of the MUTT.  In particular, Commerce

found that, while scrapers are not included in the referenced

HTSUS subheadings, such subheadings are "provided for convenience

and U.S. Customs Service purposes.  The written description [in

the final order] remains dispositive."  Final Scope Ruling at 12

(internal quotation marks and citation omitted); *see also*

*Novosteel SA v. United States*, 284 F.3d 1261, 1270 (Fed. Cir.

2002) ("[A] reference to an HTSUS number 'is not dispositive'

about the scope of an antidumping or countervailing-duty order.")

(quoting *Smith Corona Corp.*, 915 F.2d at 687)).  Thus, Commerce

initiated a scope inquiry and considered the additional factors

set forth in § 351.225(k)(2).


III. Scope Inquiry

Following its examination of the *Diversified Products*

criteria, Commerce issued its final determination on Olympia's

request for a scope ruling on the MUTT.  The Department found

that: (1) the MUTT was not specifically identified or excluded by

the scope of the HFHTs Orders; (2) neither the information

contained in the Petition or the ITC's Final Injury Determination

provided a definition of "similar hewing tools"; (3) the product

descriptions contained in the Petition, the ITC's Final Injury

Determination, and the HFHTs Orders could be "reasonably

interpreted to include the MUTT in the antidumping duty order on

axes/adzes"; and (4) an application of the *Diversified Products*

criteria supported the finding that the MUTT is properly included

within the scope of the HFHTs Orders.  *See* Final Scope Ruling at

13, 20.  Olympia challenges several aspects of the Final Scope

Ruling.

A.   Manufacturing Process

Olympia first contends that the language of the HFHTs Orders cannot reasonably be read to include the MUTT because the roll forge process used to manufacture the MUTT head is distinct from the hot forge process described in the order.

According to plaintiff:

The [MUTT] is strong and durable, made of steel and manufactured using a forging process.  The forging process, unlike the description in the scope of the [Antidumping Duty] orders, is roll forging.  A roll forging process is a process where the steel is heated then compressed between two rollers to the specified thickness then cooled.  When cooled the MUTT is cut to its finished shape.  The MUTT is not "formed to final shape on forging equipment using dies specific to the desired product shape and size."  While the MUTT is produced in a forging factory, the tools needed to make the MUTT are different from those used to make HFHTs.

Supplemental Submission on Scope Ruling Request on the MUTT (A Forged Scraper) Submitted on Behalf of Olympia Industrial, Inc. ("Supplemental Submission") at 4 (emphasis in original) (footnote omitted).

Plaintiff's counsel further pursued this point at oral argument.  *See* Tr. of Civ. Cause for Or. Arg. ("Tr.") at 3:2-8:24.

MR. COOPER:    This process of roll forging takes the heated steel, puts it through a set of rollers in order to get the proper dimensions for this material.  It is then cut to shape, heat

annealed, and then punched when necessary for additional holes. . . . So the roll forge process itself more significantly uses completely different equipment than the hot forge process . . . .

THE COURT:     Are dies used at all in the production of the MUTT?

MR. COOPER:    Yes, Your Honor.  The dies are used but it's a completely different kind of die. As opposed to an open die which the metal is forced into it, during the hot forge process this die just guides the metal into a shape that the rollers are pushing it into. . . .

THE COURT:     Now, explain to [the court] why that's not what is described [in the order].

MR. COOPER:    The roll forge process is much [more] low tech.  It basically is heated steel which is just coming down on basically a vertical type conveyor.  They cut it to form it into a shape . . . .  It's simply that the steel ingots are heated, they are rolled into these conveyor belts and there are dies on either side just to keep basically the width from coming too much.

Tr. at 3:22-25, 4:1,2, 11-16; 5:13-14; 6:23-25; 7:1, 6-9.

The Department insists that, if there are differences between the roll forge and hot forge processes, those differences are negligible and therefore cannot be reasonably understood to exclude the MUTT from the scope of the HFHTs Orders.  *See* Final Scope Ruling at 10—11, 16; *see also* Def.'s Resp. at 9—11. Commerce maintains that the critical language in the HFHTs Orders

relating to the manufacturing process is that "HFHTs are manufactured through a hot forge operation. . . ."  Final Scope Ruling at 11.  For Commerce, the words that follow, i.e., "in which steel is sheared to required length, heated to forging temperature and formed to final shape on forging equipment using dies specific to the desired product shape and size," simply explain the general elements of all forging processes.  *Id*.  In other words, Commerce asserts that the "plain language of . . . [the HFHTs Orders] clearly indicates that the HFHTs covered by these orders are manufactured through a 'hot forge operation.'" *Id*.  Thus, the Department understands the "hot forge" language as merely "describ[ing] production processes for HFHTs that are illustrative and not exclusive of variations in the forging process."  Final Scope Ruling at 11, 16 ("Since the scope allows for variations in the forging process used to produce subject merchandise, it follows that there will be variations in the equipment used to conduct the hot-forge process.").


The court finds that the differences between the roll forge and hot forge processes do not render unreasonable Commerce's interpretation of the HFHTs Orders' scope language to include the MUTT.  *See Duferco*, 296 F.2d at 1089.  It is true that the hot forge process contained in the HFHTs Orders describes the steel

as being first sheared, then heated, and then formed into shape
by dies.  In the forging process for the MUTT's heads, on the
other hand, the steel is heated first, forced into its proper
dimensions by dies, cooled, and then sheared.  Both processes are
clearly hot forging using dies to shape the metal.  Plaintiff's
counsel described the roll forge process as using dies to ensure
that the MUTT's head is produced to the proper "dimensions," and
that the die "guides the metal into a shape."  *See* Tr. at
7:10-14.  Put another way, the dies used to manufacture the MUTT
head are "specific to the desired product shape and size."  HFHTs
Orders, 56 Fed. Reg. at 6623.  The fact that the steel used to
create the MUTT head is cut after having been shaped is simply
not sufficient to remove the MUTT from the scope of the HFHTs
Orders.[6]  Thus, the court concludes that, because the variations
between the processes are not substantial, Commerce was
reasonable in finding that the MUTT is made by a forging process.

---

[6]     This situation is dissimilar from that faced by the
Court in *Tianjin Machinery Import & Export Corp. v. United
States*, 29 CIT __, __, 394 F. Supp. 2d 1369, 1374 (2005).  There,
the Court sustained Commerce's finding that tampers manufactured
through a *cast* process were not covered by the HFHTs Orders
because:

> [T]he scope language in the *HFHT Orders* makes no
> reference to any hand tool that is not identified as an
> "HFHT," *i.e.*, as a "forged" hand tool, and does not
> refer to any production of a hand tool by casting or by
> any manufacturing process that is distinct from a
> forging process.

*Id.*, 394 F. Supp. 2d at 1374 (emphasis in original).

    B.    *Diversified Products* Criteria

        1.    Physical Characteristics

Having found unconvincing plaintiff's argument concerning
the manufacturing processes, the court turns to Commerce's
examination of the MUTT using the *Diversified Products* criteria.
Commerce undertook this examination in order to determine whether
the MUTT could be reasonably said to be an "axe, adze, or similar
hewing tool" as described in the axes/adzes order.  Addressing
the factors in the order that they appear in the regulation, the
first criterion reviewed is the MUTT's physical characteristics.
*See* 19 C.F.R. § 351.225(k)(2)(i).  For plaintiff, this factor
lends substantial support to its assertion that the MUTT is not
within the scope of the axes/adzes order.


    Olympia states in its Supplemental Submission that the MUTT
has a "chisel-like blade" and is typically sold with a long
handle.  *See* Supplemental Submission at 3.  Although
acknowledging the presence of this blade, plaintiff asserts that
"[t]he physical characteristics of a MUTT are similar to those of
forged edgers, forged hoes, and forged shovels," not axes or
adzes.  *Id*. at 4 (footnotes omitted).  For plaintiff:

        An axe or adze head is placed at a 90 degree angle to
        the shaft of the tool so the ultimate user can swing
        the implement and obtains the striking power from the

> swing or arc of the tool.  A MUTT head, on the other
> hand, is not placed at a 90 degree angle, but in a
> manner that is similar to the bristles of a broom or
> the head of a rake.  The physical structure of the tool
> is entirely different from an axe or adze . . . .

Pl.'s Mem. at 9.

Olympia also focuses on the difference between the handle

attached to the MUTT blade and that which is attached to the axe

or adze head.

> Olympia imports the tool without an attached handle,
> but typically sells the tool with a wooden handle.  The
> blade of the MUTT under review measure 4"x5", 4"x8" and
> 7"x9" and the wooden shaft comes in five sizes 23",
> 30", 41", 48" and 54".  Axes typically do not come with
> wooden handles with shafts of 41", 48" and 54" because
> these measurements would make the tool inordinately top
> heavy not allowing the user to properly swing the axe.
> The wooden handles [used on the MUTT] are typically
> longer than an axe or adze . . . .
>
> Additionally, the MUTT can also be purchased with the
> nylon handle that functions as a firm grip to use for
> scraping purposes.  A similar handle is found on many
> snow shovels . . . .  Axes and adzes typically do not
> have a nylon grip since it would diminish the utility
> of the tool . . . .

Id. at 10.[7]  Thus, by emphasizing the differences between the

MUTT handle and that of an axe or adze, Olympia maintains its

position that Commerce was unreasonable in determining that the

physical characteristics of the MUTT were similar enough to an

axe or an adze to justify its conclusion that the MUTT was

---

[7]     At oral argument, plaintiff's counsel reiterated for
the court the descriptions and arguments set forth in its
memorandum supporting its Rule 56.2 motion.  *See* Tr. at
16:18-25.

subject to the axes/adzes order.

With respect to Olympia's claim that the physical appearance of the MUTT precludes a reading of the HFHTs Orders' scope language to include the MUTT, Commerce focused on the "similar hewing tool" language of the order and found that "[w]hile there will be differences [between hewing tools and axes and adzes], these differences will be minor, such that the other hewing tool can reasonably be called 'similar' to an axe or adze, and still be encompassed by the order."  Final Scope Ruling at 16.  Put another way, because the axes/adzes order covers axes, adzes, and similar hewing tools, Commerce maintains that it is not enough for plaintiff to point out the characteristics of its product that distinguish it from an axe or adze to exclude the MUTT from the scope of the order.  Thus, Commerce argues that for the MUTT to be found to lie outside the scope of the order, it must be demonstrated that the phrase "similar hewing tool" cannot reasonably be read to include the MUTT.

Commerce further asserts as without merit plaintiff's claim that the MUTT most closely resembles a shovel or other form of landscaping or digging tool.

> Olympia . . . states that the MUTT has a chisel like
> blade, which is used for cutting and chopping
> applications.  Thus, contrary to Olympia's contention,
> the MUTT is not like a shovel, as shovels are used for
> digging and excavation. . . .  Given the sharpened end
> and flatness of the MUTT blade, it is more physically
> similar to that of an axe or adze, rather than a
> shovel. . . .  Olympia's brochure states that the MUTT
> blade is "resharpenable," thereby indicating that the
> MUTT is initially sold with a sharpened edge. . . .
> While there may be some difference in the degree to
> which the edge is sharp between the MUTT and an axe or
> adze, we note that the scope contemplates that there
> will be some differences between an axe or adze and
> "similar hewing tools."

Final Scope Ruling at 15-16.  That is, Commerce found that the

MUTT, because of its steel head and sharpened edge, was similar

enough to an axe or adze head to reasonably include the MUTT

within the scope of the order.

     The court agrees with plaintiff that the MUTT indeed has

some physical characteristics that are distinct from those of an

axe or adze.  In particular, the MUTT head, unlike that of an axe

or adze, is not attached to its handle at a ninety degree angle

and the MUTT handle is considerably longer than that attached to

an axe or adze.  It is worth noting, however, that an axe head is

attached so that the blade is parallel to the handle, while that

of an adze is placed perpendicular to its handle.  Thus, the

position of the head to the handle is not a determinative

characteristic.  It is also the case that the physical

characteristics of the MUTT's head are similar to that of an axe or adze.  That is, the MUTT head is made of steel, is "strong and durable," and the blade, which is sharpened at the time of sale, may be re-sharpened.  *See* Supplemental Submission at 4 ("The [MUTT] is strong and durable, made of steel and manufactured using a forging process."); *see also* Pl.'s App. to R. 56.2 Mot. ("Pl.'s App.") at App. 3 (describing the MUTT as having a "Rolled Forged, Heat Treated Tempered Head," and "Resharpenable Blade.").

The dictionary defines the word "hew" as meaning "[t]o strike forcibly with a cutting tool . . . ."  VII The Oxford English Dictionary 194 (2d ed. 1989); *see also* The American Heritage Dictionary of the English Language 849 (3d ed. 1992) ("To strike or cut . . . .").  It follows, then, that a hewing tool is designed to be capable of performing tasks that involve cutting by striking, i.e., chopping.  In order to efficiently and effectively complete such tasks, a hewing tool must have a strong head with a sharpened blade.  As indicated by plaintiff's own sales literature, the MUTT has a forged, heat-treated and tempered steel head with a re-sharpenable blade.  *See* Pl.'s App. at App. 3.  For axes, adzes, and the MUTT, the characteristic that gives them utility as a tool is the head and blade. Therefore, as the MUTT shares with axes and adzes the physical characteristic of a substantial head with a sharpened blade that

is attached to a handle, the court finds that Commerce reasonably
concluded that the MUTT has the physical characteristics of a
hewing tool that is similar to an axe or adze.

          2.    Expectations of the Ultimate Purchaser

     The next factor Commerce considers in a scope inquiry is
whether the expectations of the ultimate purchaser of the product
are the same as those who purchase products already found to be
within the scope of an antidumping duty order.  Here, Commerce
determined that, while the MUTT has a multitude of uses, the
ultimate purchaser of the MUTT can have similar expectations to
those of a purchaser who buys an axe or an adze.  *See* Final Scope
Ruling at 17.

     Olympia insists that the ultimate purchasers of the MUTT are
not the same as those seeking to buy an axe or an adze.
According to plaintiff, because the MUTT is "generally sold in
the gardening sections of hardware and do-it-yourself (DIY)
stores[,] . . . [t]he customer that purchases a MUTT is one who
generally intends to use the MUTT for 'light' work and expects
the tool to perform a number of different tasks around the yard."
Supplemental Submission at 4—5.  Moreover, Olympia suggests that
"[t]he type of customer that purchases a HFHT includes
professionals that buy the tools for heavy work such as cutting

down trees . . . or digging ditches . . .," rather than someone
intending to do more moderate tasks.  *Id*. at 5.  Thus, Olympia
maintains that the MUTT is outside the scope of the HFHTs Orders
because, simply put, a "customer will not purchase a MUTT to cut
down a tree or to split wood."  *Id*.

> Plaintiff further states that:
>
> [A]n end user of this tool can expect that the MUTT can
> be used for a variety of activities including:
> scraping, digging, ice breaking, lot clearance,
> trenching, shingle removal, tile removal, carpet and
> floor removal, removing ice from a driveway and paint
> removal.  An axe or adze, however, cannot be used for
> these additional tasks and an end user would not
> conceive of using an axe to remov[e] shingles, remov[e]
> paint, or tak[e] out linoleum.

Pl.'s Mem. at 11.  Thus, Olympia's position is that, unlike the
consumer who purchases an axe, the MUTT consumer is not buying
the tool solely for its ability to cut or chop, but rather
expects to use the tool for many purposes including scraping and
digging.

Commerce, on the other hand, found that the MUTT's ultimate
purchasers and those who buy HFHTs "have very similar
expectations," primarily because "the over-riding purpose of the
MUTT is to cut and chop."  Final Scope Ruling at 17.  According
to Commerce, "Olympia . . . failed to provide any evidence . . .

that a purchaser of the MUTT would obtain this tool with the expectation of using it in a significantly different manner than merchandise covered by the antidumping duty order on axes, adzes, and similar hewing tools."  *Id*.


     Despite its finding, Commerce concedes that a consumer's expectations for the compared products would not be exactly the same.  *See id*.  The Department states that, while an axe is limited to activities such as felling trees, chopping and splitting wood, and hewing timber, and an adze is used principally for rough-shaping wood, the MUTT is capable of performing a number of different functions.  *See id*.; *see also* Webster's Third New International Dictionary 153, 32 (1981). Irrespective of this finding, Commerce returns to the line of reasoning it adopted when analyzing the physical characteristics of the MUTT to justify its conclusion that purchasers of the tool can have similar expectations to axe or adze consumers. Specifically, Commerce observes that "the scope anticipated that there [would] be some differences between axes or adzes and other hewing tools because it uses the word 'similar.'"  Final Scope Ruling at 17.  For Commerce, the word "similar" adequately compensates for any potential differences between the expectations of an axe or adze consumer and those of a MUTT purchaser.

Finally, Commerce found that Olympia failed to produce any evidence supporting its contention that purchasers of the MUTT tended to be "do-it-yourselfers" as distinct from professional contractors or construction personnel. *See id*. According to Commerce, "[g]iven that the vast majority of homeowners have trees and shrubs on their property and a significant percentage of homeowners have fireplaces, it is logical to assume that individual homeowners purchase a large percentage of the axes and adzes sold in hardware and DIY stores." *Id*.

The court finds that Commerce reasonably concluded that a person buying the MUTT has, at least, some of the expectations of the purchaser of an axe or adze. Indeed, where a product has a variety of uses, and thus a consumer may expect the product to perform an array of tasks, this Court has stated that:

> The applicable regulation . . . does not provide that
> the products being compared must have identical uses.
> Rather, the [Department] is directed to evaluate the
> *Diversified Products* criteria and determine whether a
> product is sufficiently similar as merchandise
> unambiguously within the scope of an order as to
> conclude the two are merchandise of the same class or
> kind.

*Wirth Ltd. v. United States*, 22 CIT 285, 300, 5 F. Supp. 2d 968, 981 (1998) (sustaining Commerce's conclusion that purchasers of profile slab have similar expectations to purchasers of carbon steel plate). In other words, if two products can be used in at

least some of their applications for similar, if not identical purposes, Commerce may conclude that purchasers of the products have similar expectations.

First, it is worth noting that while plaintiff claims that the MUTT cannot be used to fell trees or chop or split wood, neither can an adze. Nor can an axe be employed to rough-shape wood in the same manner as an adze. In addition, while an adze cannot effectively be employed by swinging it across the body at a standing object, an axe can. Here, it is undisputed that a purchaser of a MUTT may have similar expectations as a purchaser of an axe or adze. For instance, a purchaser might expect to use the MUTT with its steel head and sharpened blade to cut or chop tree roots or small branches, or for lot clearance. *See* Pl.'s App. at App. 3. Indeed, plaintiff's brochure states the "best" MUTT—blade a purchaser might buy if he or she intends to use the MUTT for chopping or cutting. *See* Pl.'s App. at App. 3 ("Original MUTT. Best for chopping and cutting with its 4" blade.). Because a consumer might reasonably purchase an axe or adze to accomplish the same or similar cutting and chopping tasks, the court finds reasonable Commerce's conclusion that the ultimate expectations of both kinds of purchasers are similar enough to support a reading of the scope language to include the MUTT.

### 3.    The Ultimate Use of the Product

Third among the *Diversified Products* criteria is the ultimate use of the product.  Here, Commerce claims that the MUTT is ultimately used to hew, cut, or chop, while Olympia insists that the MUTT is a scraper that is used for light work, such as landscaping and ice removal.

Olympia first takes issue with Commerce's finding that the MUTT is primarily used to cut or chop.  For Olympia, in order for Commerce to find that the MUTT is subject to the axes/adzes order, it must be established that the primary use of the tool is the same as an axe, adze, or similar hewing tool.  In plaintiff's view, "[i]t is clear that the class referred to in the HFHT Order relating to axes, adzes and other hewing tools has the major function of cutting or chopping.  This is not the overriding function of the MUTT."  Pl.'s Mem. at 13.  In support of this assertion, Olympia states that:

> The MUTT is clearly a scraper whose primary function is to serve as a tool that facilitates the separation of materials attached during construction such as shingles from a roof, tile from a floor, paint from a wall and other similar applications such as removing ice from a driveway.  None of the major functions of the MUTT serves to cut or chop, but merely serves as a byproduct of the tool since it has a sharp blade.  The MUTT comes with a wooden handle as described before whose length would make it extremely cumbersome to swing as an axe might. . . .

Thus, the evidence on the record clearly points to the
conclusion that the ultimate use of Olympia's MUTT is
to scrape, not to "hew" as alleged by Commerce.

*Id.*

Commerce recognized that the MUTT can be used as a scraper,
but nonetheless found that even the act of scraping shingles off
of a roof required the user to exert force similar to that
required to operate a hewing tool.  Commerce concluded that:

> Based on our review of the record, it is clear that the
> ultimate use of Olympia's MUTT is essentially to cut
> and chop.  The scope of one of the classes or kinds of
> merchandise subject to the HFHTs Orders is axes, adzes,
> and similar hewing tools. . . .  [T]he definition of
> the term "hew" is "to cut with blows of a heavy cutting
> instrument."  See Merriam-Webster's Online Dictionary
> at www.webster.com.  This definition demonstrates that
> a hewing tool is one that is relatively heavy and is
> designed to employ the weight of the tool to assist in
> cutting or chopping.  Olympia's brochure identifies the
> first two uses for MUTT as "cutting" and "chopping."
> Moreover, all of the other uses identified in the
> brochure, such as scraping, ice breaking, shingle
> removal, carpet removal, etc., involve applying force
> to an object through the use of a sharpened blade.
> Thus, both tools employ the weight of the tool to cut
> or chop.  Therefore, based upon the record evidence, we
> find that the MUTT is used for cutting tasks that are
> very similar to the cutting tasks for which axes and
> adzes are used.

Final Scope Ruling at 18 (emphasis in original).

Commerce also seeks to refute what it perceives to be
Olympia's claim that the MUTT may only be included within the

ambit of the axes/adzes order if the sole use of the tool was to cut or chop. *See* Def.'s Resp. at 13. As with the expectations of the ultimate purchaser, Commerce argues that it is not required to find that the MUTT may be used only to cut and chop for it to be included within the scope of the axes/adzes order. Rather, Commerce maintains that it need only demonstrate that some of the uses of the MUTT are like those of an axe or adze. *See id.* For Commerce, "Olympia repeatedly described the uses of scrapers to include cutting and chopping, which are akin to the uses of 'similar hewing tools.'" *Id.*; *see* Scope Ruling Request at 2 ("[The MUTT] can be used for cutting roots . . . and even for chipping ice on driveways or sidewalks."); Supplemental Submission at 4 ("[T]he tool is intended for multiple uses including cutting [and] chopping . . . ."). Therefore, Commerce insists that its finding that the MUTT is a hewing tool similar to an axe or adze is reasonable.

The court finds unconvincing plaintiff's argument that the ultimate use criterion of the *Diversified Products* factors requires the compared products to have identical uses in order for the subject product to be within the scope of an order. This Court has previously held that it is not necessary for Commerce to find that a product is exclusively used for the same purpose as another product subject to an antidumping duty order to

justify including that product within the scope of the order.
*See Novosteel SA v. United States*, 25 CIT 2, 18, 128 F. Supp. 2d
720, 735 (2001) ("[T]wo products need not be an identical
replacement for one another to have similar ultimate uses. . . .
The ultimate use criterion does not require a complete overlap of
uses to be supported by substantial evidence.").  Indeed, the
*Novosteel* Court sustained Commerce's finding that "several of the
ultimate uses [for profile slabs] are the same as those for other
products within the scope of the . . . orders."  *See id.*, 128 F.
Supp. 2d at 734 (internal citations and quotation marks omitted).


Applying that standard to the facts presented here, the
court concludes that Commerce reasonably found that the MUTT has
similar ultimate uses as axes and adzes.  The MUTT, like the
other tools, has a head of steel and a sharpened blade, and is
used to cut and chop.  According to Olympia's own sales brochure,
the first two functions listed for the MUTT are cutting and
chopping.  *See* Pl.'s App. at App. 3.  The first page of the
brochure provides the following:

> The MUTT is a multiple use tough tool.  One of the most
> versatile tools in the market and the leader in its
> class.
>
> In the short time since Village Blacksmith introduced
> the MUTT, more and more uses for this unique tool have
> been discovered . . .
> •               Cutting

- Chopping
- Scraping
- Digging
- Ice Breaking
- Lot Clearance
- Root Removal
- Sod Cutting
- Trenching
- Shingle Removal
- Tile Removal
- Carpet & Floor Removal
- Paint Removal
- Construction Clean-up
- And Many More Applications

*Id.* The brochure description is surrounded by pictures of the MUTT being used to complete various tasks, including chopping tree roots. *Id.* Thus, as it is clear that the MUTT has ultimate uses that involve cutting and chopping, Commerce was reasonable in concluding that the MUTT has similar ultimate uses to axes and adzes.


4. Channels of Trade in which the Product is Sold

The penultimate factor the Department considers when conducting a formal scope inquiry is whether the product is sold in the same channels of trade as other products that are unequivocally included within the scope of the order.

In the Final Scope Ruling, the Department found unavailing plaintiff's argument that the MUTT was not sold in the same channels of trade as axes and adzes because it was sold in the gardening department of hardware stores.  *See* Final Scope Ruling at 19.  Commerce observed that:

> There are many types of tools subject to the <u>HFHTs Orders</u> that are normally sold in the garden section of hardware and [do it yourself] stores.  Picks, mattocks, and axes are frequently considered agricultural tools and, for this reason, are more likely to be found in the garden section of a retail store rather than a tool section.

*Id*. (emphasis in original).

Aside from insisting that its product is sold in a different part of hardware stores from axes and adzes, plaintiff does not vigorously dispute this point.  *See* Pl.'s Mem. at 15.  Indeed, Olympia concedes that "the MUTT and subject HFHTs are sold in the same channel[s] of trade."  *Id*. (internal quotation marks and footnote omitted); *see also* Supplemental Submission at 5.

Thus, as plaintiff concedes that this factor does not assist its case, the court finds that this criterion adds to the reasonableness of Commerce's interpretation of the HFHTs Orders' scope language to encompass the MUTT.

5.    Manner in which the Product is Advertised and
      Displayed

The final criterion Commerce applies in determining whether

a product falls within the scope of an antidumping order is

whether the product is advertised and displayed in the same

manner as products already deemed to be subject to the order.


Plaintiff again reasserts its claim that the MUTT is not

advertised and displayed in the same manner as other heavy forged

hand tools because the MUTT is a light-work tool that is sold in

the garden section of retail stores.  *See* Final Scope Ruling at

19.  Olympia also states that it advertises the MUTT to retailers

using a separate catalog from that used to sell its other

products.  *See* Supplemental Submission at 3.  In that brochure,

however, Olympia states that the MUTT "can be cross-merchandised

in many departments for its multiple uses."  Pl.'s App. at App.

3.


The court finds plaintiff's argument regarding this factor

to be without merit.  The record indicates that both the MUTT and

other HFHTs are advertised and displayed in the garden section of

hardware stores.  In addition, plaintiff's own brochure

emphasizes that, because of its many uses, the MUTT can be sold

in a variety of different retail departments.  Thus, the manner

in which the MUTT is advertised and displayed is not materially different from that of tools unequivocally within the scope of the axes/adzes order.


CONCLUSION

The court finds that Commerce properly sought guidance from the *Diversified Products* criteria to aid its interpretation of the language of the HFHTs order.  In addition, because the MUTT is a forged, steel, durable tool with a sharpened blade that can be used for cutting and chopping, the court finds that Commerce reasonably found that the words of the order included the MUTT as a "similar hewing tool."  *See Duferco*, 296 F.3d at 1089.  Thus, the court sustains Commerce's Final Scope Ruling and dismisses this case.  Judgment shall be entered accordingly.


                                      /s/Richard K. Eaton
                                       Richard K. Eaton


Dated:    July 24, 2006
          New York, New York